# RYAN v. UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MICHIGAN.

No. 1307. Submitted April 21, 1890. — Decided May 19, 1890.

The facts stated by the court constituted a valid contract, mutually binding on the parties, for the sale to the United States of a tract of land in Michigan for purposes of fortification and garrison, as specified in the act of July 8, 1886, 24 Stat. 128, c. 747.

In the absence of the Secretary of War the authority with which he was invested by that act could be exercised by the officer who, under the law, became for the time Acting Secretary of War.

Under the Michigan statute of frauds it is not essential that the description in a memorandum for the sale of real estate should have such particulars and tokens of identification as to render a resort to extrinsic evidence needless when the writing comes to be applied to the subject matter; but it must be sufficient to comprehend the property which is the subject of the contract, so that, with the aid of extrinsic evidence, without being contradicted or added to, it can be connected with and applied to the tract intended, to the exclusion of other parcels.

A complete contract, binding under the statute of frauds, may be gathered from letters, writings and telegrams between the parties relating to its subject matter, and so connected with each other that they may fairly be said to constitute one paper relating to the contract.

If an offer is made by an owner of real estate in writing to sell it on specified terms, and the offer is accepted as made, without conditions, without varying its terms, and in a reasonable time, and the acceptance is communicated to the other party in writing within such time, and before the withdrawal of the offer, a contract arises from which neither party can withdraw at pleasure.

When, under a contract to sell real estate, the vendor delivers to the vendee a deed of conveyance for the purpose of examination, its recitals, if the memorandum of sale is not fatally defective under the statute of frauds, are competent for the purpose of showing the precise locality of the parcel referred to in the memorandum.

When one assumes by his deed to convey a title to real estate, and by any form of assurance obligates himself to protect the grantee in the enjoyment of that which the deed purports to give him, he will not be suffered afterwards to acquire and assert an adverse title, and turn his grantee over to a suit upon the covenant for redress.

In an action of ejectment, involving merely the legal title, the plaintiff is entitled to recover upon showing a good title as between him and the defendant.

EJECTMENT. The case, as stated by the court, was as follows:

This action of ejectment was brought to recover certain lands in the village of Sault Sainte Marie, Chippewa County, Michigan, of which the United States claims to be the owner in fee, and the possession of which is alleged to be wrongfully withheld from the government by the defendant, Thomas Ryan. They are described in a deed from Ryan and wife to the United States, of date December 18, 1886, and recorded in the proper local office on the 25th of May, 1887. At the conclusion of the evidence the jury, under the direction of the court, returned a verdict for the government, and a judgment was entered against the defendant. The present writ of error brings that judgment here for review. The principal question to be determined is whether the title to the premises in dispute ever passed from the defendant to the government. It is claimed that the negotiations in reference to the sale of these premises never resulted in a binding contract between the United States and the defendant; that the deed of December 18, 1886, although signed and acknowledged by the defendant and his wife, was delivered to the officers of the government, pending such negotiations, only for examination,

and was not placed upon record with the assent, express or implied, of the grantors; that the proposal made in Ryan's name for the sale of the property was withdrawn by him before it was accepted, and before the above deed was filed for record; and that, therefore, no title passed to the United States. Each of these propositions is controverted by the government.

The facts upon which these several propositions depend are very numerous, and are to be gathered principally from letters and telegrams between the parties and their agents. They are, substantially, as follows:

By the third section of an act of Congress, approved July 8, 1886, 24 Stat. 128, c. 747, the Secretary of War was authorized to sell the military reservation known as Fort Brady, in the village of Sault Sainte Marie, in the State of Michigan, except certain portions thereof. By the fourth section he was authorized to purchase grounds in or near the same village, suitable and sufficient for fortification and for garrison purposes, and to construct thereon the necessary buildings, with appurtenances, sufficient for a four-company military post, to be known as Fort Brady, in accordance with estimates to be prepared by the War Department; and the sum of one hundred and twenty thousand dollars was appropriated to enable the Secretary to comply with the provisions of the act. That section contained the proviso "that the title to lands authorized to be purchased under the fourth section of this act shall be approved by the Attorney General." It was declared by the sixth section that section three should not take effect until the purchase of the new site provided for in section four should have been effected.

By direction of the Secretary and in execution of the above act, a board of officers of the army was constituted, to meet at Fort Brady, Michigan, on the 7th of September, 1886, or as soon thereafter as was practicable, for the purpose, among others, of selecting for purchase suitable and sufficient grounds as indicated in the fourth section of the above act of Congress. The board was directed to report by telegraph to the Adjutant General with its recommendation for the approval of the Sec-

retary of War, as soon as a new site was selected. Shortly before the day fixed for its convening, Ryan and his attorney, Mr. Cady, met in Detroit, and during their interview in that city some conversation was had between them in relation to the meeting of this board, and the purposes for which it was to be convened. It appears that for a number of years prior to that date this property had been mentioned in military circles and among citizens as a possible site for a fort.

On the 7th of September, 1886, Cady telegraphed from Sault Sainte Marie to Ryan at Detroit, Michigan: "Telegraph price to me of southwest quarter of southwest quarter of section 6 and southeast quarter of southeast quarter of section 1 for Fort Brady. Answer immediately." To this telegram Ryan responded on the same day under his own signature: "Twelve thousand dollars." On the next day Ryan, by Cady, telegraphed to the board convened by the Secretary of War: "I am instructed by Mr. Ryan to offer the S. W. ¼ of S. W. ¼ of sec. 6 and the S. E. ¼ of the S. E. ¼ of sec. 1, (both in towns. 47 N. of ranges 1 E. and W.), containing eighty (80) acres, more or less, if sold together, for the sum of twelve thousand dollars ($12,000). Although not authorized yet, I assume that Mr. Ryan would sell any portion of said lands at a price in ratio to the above (i.e., $150 per acre)." To this telegram was appended a postscript: "P. S. The above offer is subject to the opening of Easterday Avenue along the south line." Under date of September 9, 1886, the president of the board of officers telegraphed to the Adjutant General at Washington: "The board recommends for purchase the two adjoining forty-acre tracts on the hill, half mile due south of west end of canal, divided through the centre of length by meridian of Sault Ste. Marie, aggregating about seventy-five acres; price, twelve thousand dollars." General Drum, Acting Secretary of War, under date of September 11, 1886, made the following endorsement on this telegram: "Under ordinary circumstances action in this case would have been deferred until the return of the Secretary of War or the Lieutenant General. In view, however, of the importance of the selection of this site, and of the fact that inaction here would delay further action by the

board, which is now in Michigan awaiting reply, the recommendation of the board as contained in the within telegram is approved. The board will be advised by telegraph of such approval." On the same day General Kelton, Acting Adjutant General, telegraphed to Lieutenant Colonel Abbot, president of the board: "Despatches nine (9) and eleven (11) instant received. The Secretary of War approves the recommendation of board for purchase of two (2) tracts designated at the price of twelve thousand dollars ($12,000). Acknowledge receipt. No further instructions." This telegram was received; for on the 11th of September, 1886, Lieutenant Colonel Abbot, the president of the board of officers, wrote from Fort Brady to Ryan at Sault Ste. Marie: "You are hereby notified that the Acting Secretary of War has approved the recommendation of the board of officers now in session at this post, that your proposal dated September 8, 1886, be accepted, viz., for the sale of certain tracts of land described in your proposal as follows: 'The S. W. $\frac{1}{4}$ of the S. W. $\frac{1}{4}$ of sec. 6 and the S. E. $\frac{1}{4}$ of the S. E. $\frac{1}{4}$ of sec. 1, subject to the opening of Easterday Avenue along the south line, for twelve thousand dollars.'" This letter was first delivered to Mr. Cady, and was by him delivered to Ryan within three or four days after it came to his hands. The receipt of it by Ryan is not disputed.

On the 30th of September, 1886, the Acting Secretary of War wrote to Colonel Poe, one of the board: "The recommendation of the board, approved by the department, selects a tract of about 75 acres of land at Sault Ste. Marie, owned by Thomas Ryan, as the new site for Fort Brady, at the proposed price of $12,000. Papers on file show Mr. Ryan's address to be Michigan Exchange Hotel, Detroit. Please take the proper steps without delay to collect and forward to this department the necessary deeds and other title papers for the conveyance of this land to the United States for examination by the Attorney General, as required by law. General Orders 47, H'dq'rs of Army, A. G. O., of 1881, publishes regulations of the Department of Justice concerning such title papers, a copy of which will be forwarded to you by mail." Under

date of October 4, 1886, Mr. Cady wrote to the Adjutant General of the Army at Washington: " On the 11th ulto. Mr. Thomas Ryan, of Sault Ste. Marie, Mich., was notified by Henry L. Abbot, Lieutenant Colonel of Engineers, president of board, that his offer of certain lands as a site for Fort Brady had been accepted. I have the honor of acting for Mr. Ryan in preparing his title for the Attorney General. Will you please furnish me with a copy of the printed directions for preparing abstracts for the use of the government? Any communication relative to the matter should be addressed to W. B. Cady, Sault Ste. Marie, Mich." Two days thereafter, October 6, 1886, Colonel Poe wrote to Ryan: " I have received from the War Department the following letter of instructions, viz.: [Letter above of September 30, 1886]. I have, therefore, to request that you will proceed as rapidly as possible with the preparation of the requisite papers, and to aid you in this I enclose herewith a copy of General Orders No. 47, Headquarters of the Army, Adjutant General's Office, May 13, 1881, above referred to. Please acknowledge receipt of this communication and inform me as to how soon you can begin the preparation of the papers in question." The general order referred to in this letter was one issued from the Headquarters of the Army, by direction of the Secretary of War, and embodying certain regulations established by the Department of Justice for the guidance of those drawing conveyances, making abstracts, or collecting evidences of title to land in cases in which it is the duty of the Attorney General to pass upon the validity of such title. Among other requirements was one to the effect that a deed to the United States should be acknowledged according to the laws of the State where the land lies, and one (XX) directing that before any papers relating to title were sent to the Department of Justice for examination they should be submitted to the proper District Attorney of the United States.

Under date of October 13, 1886, Mr. Cady thus acknowledged the receipt of Colonel Poe's letter of the 6th inst. to Thomas Ryan, saying: " I am acting for Mr. Ryan in preparing his title for the inspection of the Attorney General. I expect to

be able to send on the necessary papers in from six to eight weeks." Some time having passed without anything being heard either from Mr. Ryan or from his attorney, Cady, Colonel Poe, under date of December 10, 1886, wrote to the latter urging him to forward "the title papers to the Ryan property purchased by the United States for a new site for Fort Brady." To this letter Mr. Cady replied, under date of December 11, 1886, stating that he had met with unexpected delay in obtaining certain papers, and saying: "If I understand directions, I am to first send papers to G. Chase Godwin, U. S. District Attorney for this district. Do you wish them first sent to you? Also, should the deed from Ryan to the government be recorded before forwarding? Will you honor me by answering the above questions at once? I expect to start for Detroit on the 20th inst., and if you wish to see the papers I will bring them down for your examination and send to Mr. Godwin from Detroit."

The next letter, in the order of their dates, which appeared in evidence, was one under date of December 22, 1886, from Colonel Poe to Mr. Godwin, United States District Attorney at Grand Rapids. In that letter the writer said: "In accordance with paragraph XX of the circular of the Attorney General of the United States, dated October 27, 1875, W. B. Cady, Esq., attorney for Mr. Thomas Ryan, of Sault Ste. Marie, Michigan, visits you for the purpose of submitting the title papers to a tract of land which the government desires to purchase for a new site for Fort Brady. The War Department is anxious to complete the transaction as soon as possible, and your early action would greatly facilitate matters." This letter was delivered to Mr. Godwin by Mr. Cady, the latter having with him abstracts, certified copy of deeds, maps, etc., relating to the title to the property. On the same day as the letter last referred to, Cady & Cady wrote to the Adjutant General, at Washington, enclosing the papers, "relating to Thomas Ryan's sale to the government," including a "deed of Thomas Ryan et ux. to U. S. to carry out above sale," and "authority of Thomas Ryan and E. K. Roberts, cashier, relating to your draft, etc." Under date of January 3, 1887,

Mr. Cady addressed a letter to the District Attorney, in which he said: "I enclose deed, etc., in the Ryan sale. This makes papers complete. I would respectfully call your attention to the following: 1st. I enclose two deeds of lands in question, one in exact conformity to Mr. Ryan's bid, the other reserving a strip of land 33 feet wide off east side for street purposes; 2d. That the dower right, if any, of Mrs. Warner is cut off by the state tax deeds held by Mr. Ryan. Most respectfully asking you to consider the paper at as early a date as possible and to communicate to me the results, I submit the papers to your inspection. In conversation with General Poe to-day he seemed quite certain that the papers would be sent to him after your examination of them, and that he should send them to the War Department, you sending your report to the Attorney General. Would you kindly inform me what course you have decided to follow in the matter?"

Among the papers enclosed with this letter was a deed, duly executed and acknowledged, by Ryan and wife, for the premises in dispute. It contained a covenant that the grantors were seized of the premises in fee simple, and would warrant and defend the same against all lawful claims whatsoever. That deed excepted a strip off the south side of the southeast quarter of the southeast quarter of section one in township 47 N., thirty-three feet in width, reserved for Easterday Avenue, and, also, a strip off the south side of the southwest quarter of the southwest quarter of section six in same township, of like width, reserved for the same avenue, and a strip of like width, off the east side of the latter forty acres, for street purposes. During the latter part of January or first of February, Cady received a letter from the District Attorney asking for further information in regard to what was called the Warner dower, and in respect to a mortgage held by the Citizens' Bank of Detroit.

Under date of March 18, 1887, all the papers were forwarded by the District Attorney to the Attorney General. In that letter the former expressed the opinion that the title to the lands was sufficient. On the next day, March 19, 1887, the District Attorney wrote to Cady: "Yours of the 16th inst.

received. The abstract and accompanying papers in the matter of the title to the Fort Brady reservation proposed site have been forwarded to General Poe, together with my opinion regarding the same. I have recommended and advised that the title is good and complete." The papers referred to in this letter were immediately forwarded by General Poe to the Secretary of War. The latter, under date of March 28, 1887, referred them, together with the deed of conveyance by Ryan and wife to the United States, to the Attorney General, with the request that the War Department be advised as to the validity of the title to the lands in question, and whether the above deed was sufficient to vest the title in the United States.

While these papers were in the hands of the Attorney General, Brennan & Donnelly, attorneys for Ryan, wrote to the Secretary of War: "Mr. Thomas Ryan of Sault Ste. Marie, in this State, with whom your department had some negotiations some months ago for the purchase of the S. W. $\frac{1}{4}$ of the S. W. $\frac{1}{4}$ of section 6, the S. E. $\frac{1}{4}$ of the S. E. $\frac{1}{4}$ of section 1, in said town., as a site for Fort Brady, has instructed us to say that he has arranged for a different disposition of the property, and further negotiations are unnecessary. Will you please return to him all papers submitted to the government concerning said property?" This document was referred by the Secretary to the Lieutenant General of the army, who was informed that the title papers had been forwarded to the Attorney General, and that a copy of the document had been sent to the latter. Under date of April 9, 1887, the Attorney General returned the papers to the Secretary of War. They were sent again to the Attorney General on the 16th of April, 1887, the latter being advised by the Secretary of War that their return was not desired, and that the opinion of the Attorney General was desired as to the validity of the title to these lands, as to the sufficiency of the deed to vest the title in the United States, and as to whether there was a sufficient agreement in writing to bind Ryan notwithstanding his attempted withdrawal from the agreement. On the 18th of May, 1887, the Attorney General

returned the papers to the Secretary of War, with a written opinion to the effect that the deed was sufficient to pass title to the United States provided nothing had transpired since its execution to affect the title. He advised the Secretary of War that information on that point should be obtained before completing the purchase price, by having search made for liens, incumbrances, etc., down to that date. The Attorney General, on the next day, transmitted the deed of Ryan and wife to the District Attorney, instructing him to continue the search for liens, incumbrances, etc., subsequent to the date of the deed, and saying : " Should the title be found to be unaffected thereby and to remain unchanged, you are instructed to have the deed recorded, after which payment of the purchase money will be made in the usual way through the War Department. Please attend to this promptly and report your doings under these instructions as early as practicable."

On the 28th of May, 1887, the District Attorney wrote to the Attorney General, acknowledging the receipt of the latter's letter of the 19th, and saying : " I found upon investigation that he had got a deed from one Anne E. Warner, who made claim of dower, but which claim had no force, I thought, but I found that on the 4th of April Thomas Ryan and wife deeded to the village of Sault Ste. Marie a strip of land 40 feet wide off the east side of the southwest quarter of the southwest quarter of section 6, and 40 feet off the west side of the southeast quarter of the southeast quarter of section one, making together a strip 80 feet wide, for street purposes. I hereto attach a slip, with the land marked out, showing you what has been done to affect the title to the land. Notwithstanding all this, I recorded the deed running to the United States. Perhaps I should explain further. Since this land was contracted to the government a very remarkable business boom has struck Sault Ste. Marie, and Mr. Ryan claims that the land deeded to the government is worth fifty or sixty thousand dollars. He has made a claim that the government was dealing with the expectation of purchasing it, and assuming that it had not been accepted as yet, but was under

consideration by the government, while I supposed you had accepted his offer to sell the land for $12,000. This being the situation, I took the responsibility of recording the deed, notwithstanding that eighty feet had been deeded away, thinking that it would be the safest way to secure the government, as the property is unquestionably worth more than $12,000, although the conveyance of the street should be valid. There is no doubt that the village officers knew of such contract when made, and no doubt exists in my mind but the village officers prefer that the government should own this property. The facts seem to be that Thomas Ryan had other lands adjoining this, or in the vicinity, which he had sold for fabulous prices, and he has no doubt promised to other parties the opening of this street, and in pursuance of this fact has made this deed. As this now stands the title of the land is in the government, except only that Ryan has conveyed away this 80-foot strip. I shall be pleased to take any steps that may be directed in this matter." Under date of June 9, 1887, the Attorney General transmitted to the Secretary of War the letter of the District Attorney, in which he said: " It appears that since the date of that deed, and before the same was recorded, namely, on the 4th of April, 1887, the said Ryan and wife deeded a small part of the premises to the village of Sault Ste. Marie for the' purpose of a street. Notwithstanding this, the United States attorney thought it advisable to put the deed to the United States on record. By the law of Michigan an unrecorded deed is ' void as against any subsequent purchaser in good faith and for a valuable consideration of the same real estate or any portion thereof whose conveyance shall be first duly recorded.' If the conveyance to the village has been first duly recorded, and is otherwise within the provision of law just adverted to, its title to so much of the premises as is granted thereby would doubtless be superior to a title derived under the deed to the United States. However, should the use of that part of the premises for the purpose of a street be unobjectionable, the failure to derive the title thereto under such deed may be unimportant."

The Lieutenant General of the Army recommended that the ground be not purchased unless the 80-foot right of way referred to be given up by the village. This recommendation was approved and the papers were referred to the Chief of Engineers, Colonel Poe, to ascertain whether the village would relinquish the strip 80 feet wide. The Secretary and the Lieutenant General decided " to await further action of the village council of Sault Ste. Marie, that the rights of the United States should be maintained, and that payment must be withheld until the roadway is relinquished to the government, thus making the title of the United States good to the whole tract conveyed by the deed of Thomas Ryan to the United States." The result desired in this particular was attained; for by deed of May 22, 1888, the village, which had then become a city, relinquished to the United States all the rights that it had obtained from Ryan and wife under their deed to it of April 4, 1887.

It was admitted at the trial that previous to the action of the village council authorizing said deed, namely, May 22, 1888, Major Adams, on behalf of the United States, made a tender to Ryan of the sum of twelve thousand dollars. Before this tender, Adams had an understanding with the local authorities that the village would make the relinquishment, which they shortly thereafter did.

It appeared in evidence that Ryan was not the holder of the legal title at the beginning of the negotiations between him and the government. On the 6th of June, 1883, he and his wife conveyed to James R. Ryan by deed, which was recorded, without any reservation therein for streets. By deed of June 16, 1883, recorded June 19, 1883, James R. Ryan and wife, for the consideration of one dollar " and other considerations," conveyed by quit-claim deed ten acres of these lands to Remegius Chartier, S. J., and his successors and assigns, " to be forever the property of the Fathers of the Society of Jesus for the purpose of education and other works, in accordance with their constitution, with the power to sell and dispose of the same to accomplish the same ends in case circumstances should require it; together with all and singular

the hereditaments and appurtenances thereunto belonging or in anywise appertaining; to have and to hold the said parcel of land hereinbefore described to the said party of the second part, and to his successors, heirs and assigns to the sole and only proper use, benefit and behoof of the said party of the second part, [his] successors, heirs and assigns forever." Chartier, for the consideration of one dollar, by deed of November 26, 1886, recorded November 29, 1886, reconveyed said parcel to James R. Ryan. The latter, by deed of December 6, 1886, recorded December 13, 1886, conveyed to Thomas Ryan the same premises which the latter and wife had conveyed by their deed of June 6, 1883.

Other facts are set out in the bill of exceptions, but the above are all that are necessary to be stated.

*Mr. Michael Brennan, Mr. John C. Donnelly* and *Mr. Isaac Marston* for plaintiff in error.

I. There was no contract between the parties valid under the statute of frauds of Michigan. *Gault* v. *Stormount*, 51 Michigan, 636, and cases cited.

II. There was no mutuality in the alleged contract, which was essential to its validity. *Wilkinson* v. *Heavenrich*, 58 Michigan, 574; *Richardson* v. *Hardwick*, 106 U. S. 252.

III. An acceptance by the Secretary of War was necessary before the proposal could become a binding contract. *Gilbert & Secor* v. *United States*, 8 Wall. 358; *Parish* v. *United States*, 8 Wall. 489; *Filor* v. *United States*, 9 Wall. 45; *United States* v. *Burns*, 12 Wall. 246.

IV. Until delivery and acceptance of the deed, either party could terminate the negotiations, and Ryan did, actually, terminate them.

V. The papers were submitted to the United States only for inspection. This was not a delivery, transferring title. *Wadsworth* v. *Warren*, 12 Wall. 307; *Graves* v. *Dudley*, 20 N. Y. 76; *Parker* v. *Parker*, 1 Gray, 409; *Murdoch* v. *Gilchrist*, 52 N. Y. 242; *Eggleston* v. *Wagner*, 46 Michigan, 610; *Taft* v. *Taft*, 59 Michigan, 185; *Pennington* v. *Pennington*,

75 Michigan, 600; *McCullough* v. *Day*, 45 Michigan, 554; *Martz* v. *Eggemann*, 44 Michigan, 430; *Patrick* v. *Howard*, 47 Michigan, 40; *Hyne* v. *Osborn*, 62 Michigan, 235; *Hendricks* v. *Rasson*, 53 Michigan, 575; *Stevens* v. *Castel*, 63 Michigan, 111.

VI. Chartier, the trustee in the deed from Ryan, had no power to reconvey the tract to him, and consequently nothing passed by his deed. 2 Howell's Stats. § 5565, § 5573, subd. 5; § 5583; *Methodist Church* v. *Clark*, 41 Michigan, 730, 739; *Pierce* v. *Grimley*, 43 N. W. Rep. 932. And this may be taken advantage of in ejectment. *Doolan* v. *Carr*, 125 U. S. 618; *Reynolds* v. *Iron Silver Mining Co.*, 116 U. S. 687, 698.

*Mr. Solicitor General* for defendants in error.

MR. JUSTICE HARLAN, after stating the facts, as above reported, delivered the opinion of the court.

No question is made in this case, as in view of the decisions of this court and the statutes of Michigan there could not properly be, in respect to the right of the United States, by purchase, to acquire the premises in dispute for the purposes of fortification and garrison expressed in the act of July 8, 1886. *Kohl* v. *United States*, 91 U. S. 367; *United States* v. *Jones*, 109 U. S. 513; *Van Brocklin* v. *State of Tennessee*, 117 U. S. 151, 154; 2 Howell's Anno. Stats. Mich. §§ 5202, 5203. Nor can it be doubted that what was done by the Secretary of War and by other officers of the government acting under his direction was within the limits of the authority conferred by that act. It is equally clear that in the absence of the Secretary the authority with which he was invested could be exercised by the officer who, under the law, became for the time Acting Secretary of War. Rev. Stat. § 179.

But the defendant insists that the alleged contract between him and the government was not valid or binding under the statute of frauds of Michigan, which provides that " every contract for the leasing for a longer period than one year, or for the sale of any lands, or interest in lands, shall be void,

unless the contract, or some note or memorandum thereof, be in writing and signed by the party by whom the lease or sale is to be made, or by some person by him lawfully authorized by writing." Howell's Stat. § 6181. His contention is, that the writings, including telegrams, which are relied upon to establish a valid, binding contract, do not, in themselves, show that the lands therein referred to are the lands in question, and, therefore, no written memorandum, such as the statute requires was executed. In support of this view we are referred to *Gault* v. *Stormount*, 51 Mich. 636, 638. In that case, the memorandum was only a receipt, given at Wyandotte, Michigan, by the party selling, showing that he had received from the party proposing to buy " the sum of $75 as part of the principal of $1050 on sale of my house and two lots on corner of Superior and Second streets in this city." This receipt was held to be insufficient to answer the requirements of the statute, for the reason that " though it specified the purchase price, it failed to express the time or times of payment, and there is no known and recognized custom to fix what is thus left undetermined; " the court adding that " a memorandum, to be sufficient under the statute, must be complete in itself, and leave nothing to rest in parol." It will be observed that the memorandum in that case was not rejected as insufficient because of any want of fulness in the description of the premises, nor is there any intimation that such description, (if the case had turned upon that point,) might not have been aided by extrinsic parol evidence, identifying the premises intended to be sold. That case did not in any degree modify the decision in *Eggleston* v. *Wagner*, 46 Mich. 610, 618, where the court said : " A further objection is that the proposal did not sufficiently describe the real estate to satisfy the statute of frauds. The general principle is not questioned. The degree of certainty with which the premises must be denoted is defined in many books, and the cases are extremely numerous in which the subject has been illustrated. They are all harmonious. But they agree in this, that it is not essential that the description have such particulars and tokens of identification as to render a resort to extrinsic aid entirely needless when the

writing comes to be applied to the subject matter. The terms may be abstract and of a general nature, but they must be sufficient to fit and comprehend the property which is the subject of the transaction; so that with the assistance of external evidence, the description, without being contradicted or added to, can be connected with and applied to the very property intended and to the exclusion of all other property. The circumstance that in any case a conflict arises in the outside evidence cannot be allowed the force of proof that the written description is in itself insufficient to satisfy the statute."

Did the papers which passed between the parties, constituting the memorandum of the transaction, contain such a description of the lands in dispute as was sufficient, in connection with extrinsic evidence not contradictory of nor adding to the written description, to meet the requirements of the Michigan statute of frauds? We say "the papers," because the principle is well established that a complete contract binding under the statute of frauds may be gathered from letters, writings and telegrams between the parties relating to the subject matter of the contract, and so connected with each other that they may be fairly said to constitute one paper relating to the contract. *Beckwith* v. *Talbot*, 95 U. S. 289, 292; *Ridgway* v. *Wharton*, 6 H. L. Cas. 238; *Coles* v. *Trecothick*, 9 Ves. 234, 250; *Cave* v. *Hastings*, 7 Q. B. D. 125, 128; *Long* v. *Millar*, 4 C. P. D. 450, 456.

Turning now to the evidence in the case there would seem to be no ground for doubt as to the sufficiency of the description of the lands. Cady's telegram of September 7, 1886; Ryan's response thereto on the same day; his written proposal through Cady to the board of army officers on the 8th; and the formal written notification to Ryan on the 11th of September, by the president of the board, of the acceptance by the Acting Secretary of War of his proposal of the 8th, show that the lands which the defendant proposed to sell to the United States, and which the government agreed to buy, for the sum of $12,000, was the "S. W. ¼ of the S. W. ¼ of sec. 6, and the S. E. ¼ of the S. E. ¼ of sec. 1, subject to the opening of Easterday Avenue along the south line." And this

description of the premises must be taken in connection with
the act of Congress, showing that the authority given to the
Secretary of War was to purchase grounds "in or near the
village of Sault Ste. Marie." It is said that neither the tele-
gram of Cady to Ryan nor the latter's response thereto identi-
fied the lands by naming any township or range. But Ryan's
written proposal through Cady to sell did give the township
and range, and the government's written acceptance of the
11th of September referred to that proposal by its date of
September 8, 1886. It is well said by the Solicitor General
that, in the absence of any evidence to show it, or to raise
doubt upon the subject, the presumption is not to be indulged
that Ryan owned, in or near the village of Sault Ste. Marie,
two tracts of land in different townships and ranges which
would answer the description of "southwest quarter of south-
west quarter of section 6, and southeast quarter of southeast
quarter of section 1." The only fact which gives even plausi-
bility to the contention we are considering is the absence from
the written proposal of Ryan, as well as from the written
acceptance of the government, of any express statement as to
the particular village in which the lands were situated. But
this defect, if it be one, is supplied by the communication of
Colonel Poe, of October 6, 1886, in which he transmits to
Ryan the letter of instructions from the War Department of
September 30, 1886, in which the lands that the board recom-
mended to be bought — the recommendation alluded to in
the government's letter of acceptance of September 11, 1886,
addressed to Ryan — are referred to as containing "about 75
acres of land at Sault Ste. Marie." Besides the deed executed
by Ryan and wife, and delivered by them to the United
States, describes the lands as being "in the village of Sault
Ste. Marie." Whatever may be said as to the effect of this
deed in passing title, if it was delivered only for purposes of
examination, or if the previous memorandum of sale had been
for any reason fatally defective under the statute of frauds,
its recitals, coming as they do from the vendor, are competent
for the purpose of showing the precise locality of the property
which the memorandum of sale was intended to embrace.

*Jenkins* v. *Harrison,* 66 Alabama, 345, 355, and authorities there cited.

For these reasons we are of opinion that the written proposal of the defendant to sell the premises in dispute at the price of twelve thousand dollars, and the written acceptance of that proposal by the government, through its authorized officers, constituted a valid contract, mutually binding upon the parties under the Michigan statute of frauds. In this view, the notification given by the defendant on the 1st of April, 1887, to the Secretary of War, that he had arranged for a different disposition of the property, and that further negotiations were unnecessary, did not affect the rights of the government. A mere offer to sell real estate, upon specified terms, may undoubtedly be withdrawn at any time before its acceptance. Such is the general rule. But if the offer be accepted without conditions, and without varying its terms, and the acceptance be communicated to the other party without unreasonable delay, a contract arises, from which neither party can withdraw at pleasure. Was there an unreasonable delay upon the part of the government in accepting the defendant's offer? Clearly not. The acceptance was within a few days after the offer. Nor, after the acceptance, was there any such delay by the government as entitled the defendant to abandon the contract, or to treat it as rescinded. He was informed by the act of Congress, of which he was bound to take notice, that the approval of the title by the Attorney General was a condition precedent to the payment by the Secretary of War of the price for the lands. He recognized the right of the government to have the title examined. He was furnished with a copy of the regulations prescribed by the Department of Justice for the examination of the titles to property where such titles were to be passed upon by the Attorney General. The defendant himself was dilatory in furnishing the necessary abstracts and papers relating to the title. And while the Attorney General was engaged in the examination of the title, he assumed to withdraw from the contract, and to convey a part of the premises to the village of Sault Sainte Marie. The delay which occurred after that

conveyance came to the knowledge of the government was necessary in order that it might, before paying for the lands, secure a reconveyance of such part thereof as had been conveyed by Ryan to the village. That result being obtained, the government made the tender of the full amount it agreed to pay.

.It is said, however, that the deed was delivered to the officers of the government only for the purpose of an examination of the title, and that they had no right to put it on record. This view has been pressed upon the theory that there was no valid contract upon the part of Ryan for the sale of the land, and that he had the right to withdraw his proposal to sell at the time he assumed to do so. If he had not been bound by contract to sell the lands, at the time he withdrew his offer, the placing of the deed upon record would have been unauthorized, and might not have passed the title as between the defendant and the United States. In the case supposed the government, upon being notified of the withdrawal of the offer to sell, would have been under a duty to return the deed. But we have seen that long before such attempted withdrawal there was a valid contract that bound the parties, the one to sell and the other to buy the lands at an agreed price. The attempt to withdraw the offer did not, therefore, impair the rights of the government. The deed was delivered in execution of that contract, with the intention that it should become presently operative when the Attorney General approved the title, and the government had the right to put it on record when the title was approved by that officer. The title was approved by him, and thereupon the government became bound to pay the price it agreed to pay for the lands. The delay in making the tender was due to Ryan's efforts to evade or defeat his contract.

There are one or two other matters that require to be examined. It is said that the defendant was not the owner of these lands at the time when, according to the views already. expressed, there arose a binding contract between him and the United States. But the title was in him prior to 1883, and was again in him on the 6th of December, 1886, as well

as on and after December 18, 1886, when he and his wife executed and acknowledged the deed of the United States. If he chose to bind himself by contract to sell land that he did not at the time own, but the title to which he subsequently acquired and conveyed by general warranty, he will not, in an action of ejectment based upon the title so conveyed, be heard to say that he had no title at the time he agreed to sell.

It is, also, said that the deed from Remegius Chartier, S. J., to James R. Ryan, for ten acres of these lands, and the deed from James R. Ryan and wife to Thomas Ryan were void, as to that ten acres, because the previous deed of James R. Ryan and wife to Chartier showed, upon its face, that said ten acres were the property of "The Fathers of the Society of Jesus for the purposes of education and other works in accordance with their constitution." In the view we take of this question it is unnecessary to determine the precise nature of the interest, if any, acquired by that society in the ten acres conveyed to Chartier, nor to determine whether the court below correctly interpreted the words "absolutely void" in section 5583 of the Statutes of Michigan, which declares that "when the trust shall be expressed in the instrument creating the estate, any sale, conveyance or other acts of the trustees, in contravention of the trust, shall be absolutely void." The legal title was in Chartier, his successors and assigns, in trust for the purposes of education and other works in accordance with the constitution of his society, "with power to sell and dispose of the same to accomplish the same ends in case circumstances should require it." He thus had the power, under some circumstances, to sell and convey. He did sell and convey by a deed which did not disclose upon its face a violation of the trust, and his grantee, holding then the legal title to the entire premises in dispute, conveyed to the defendant, who with his wife covenanted in their deed to the United States that they were seized of the premises in fee simple, free from all incumbrances whatever, and that they, and their heirs, executors and administrators, would warrant and defend the title against all lawful claims whatsoever. The title acquired

by him, after he contracted to sell to the United States, enured
to the benefit of his grantee.   He is estopped to dispute his
grantee's right of possession, or to dispute, as between him
and his grantee, the title he assumed to convey with general
warranty.   In  *Van Rensselaer* v. *Kearney*, 11  How. 297, 325,
it was said that the principle deducible from the authorities
was " that whatever may be the form or nature of the convey-
ance used to pass real property, if the grantor sets forth on
the face of the instrument, by way of recital or averment, that
he is seized or possessed of a particular estate in the premises,
and which estate the deed purports to convey; or, what is the
same thing, if the seizin or possession of a particular estate is
affirmed in the deed, either in express terms or by necessary
implication, the grantor and all persons in privity with him
shall be estopped from ever afterwards denying that he was
so seized and possessed at the time he made the conveyance.
The estoppel works upon the estate, and binds an after-ac-
quired title as between parties and privies."   See, also, *Bush* v.
*Cooper*, 18 How. 82, 85 ; *Crews* v. *Burcham*, 1 Black, 352, 357 ;
*Moore* v. *Crawford*, 130 U. S. 122, 130 ; *Jackson ex dem. Dan-
forth* v. *Murray*, 12 Johns. 201.   And such is the established
doctrine of the Supreme Court of Michigan, which said, in
*Smith* v. *Williams*, 44 Michigan, 240, 242 — an action of eject-
ment — " that when one assumes by his deed to convey a
title, and by any form of assurance obligates himself to pro-
tect the grantee in the enjoyment of that which the deed pur-
ports to give him, he will not be suffered afterwards to acquire
or assert a title and turn his grantee over to a suit upon his
covenant for recress."   See also *Case* v. *Green*, 53 Michigan,
615, 620.

The United States has established a good title and right as
against the defendant, and that is sufficient to entitle it to
judgment in this action of ejectment.

*These considerations require an affirmance of the judgment
below and it is so ordered.*