## SHELL EASTERN PETROLEUM PRODUCTS, Inc., v. WHITE et ux.
### No. 5770.

Court of Appeals of the District of Columbia.
Argued May 4, 5, 1933.
Decided June 26, 1933.

Rehearing Denied Dec. 18, 1933.

380

H. Prescott Gatley, of Washington, D. C., for appellant.

W. Gwynn Gardiner, South Trimble, Jr., and W. Gwynn Gardiner, Jr., all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

This is a bill in equity in which appellant was defendant below and appellees were plaintiffs. The purpose of the bill was to have specific performance of a contract dated the 21st of April, 1930, by which, it is claimed, appellant agreed to lease the premises of the appellees for a period of eight years at an annual rental of $6,000 a year and to purchase the property on or before the expiration of the lease period for $100,000. The memorandum of the contract is in the following words:

"April 21–30.
"Morgage we secure $50,000.

"Lease 8 year $6,000 per year we pay all Taxes insurance ects. obligation to purchase within 8 year for $100,000 by paying $50,000 cash assume morgage $50,000 Rent payable 1 year in advance. this does not include gasoline ects. on hand—Mr. White signs will not go into gasoline business in this district.

"David T. Smith.
"J. F. White.

"Commission payable at time of closing lease to McKeever & Goss.
"4/30–30        J. F. White."

The trial court made certain findings of fact and conclusions of law, and in conformity with its findings and conclusions entered a decree for plaintiffs (appellees). The main facts found are as follows:

"2. * * * That during the early part of December 1929 the defendant company sent one David T. Smith to the District of Columbia to acquire for the company gasoline stations, or sites upon which stations could be erected, for the purpose of extending the company's business in the District of Columbia; that the defendant company held out to the public that the said David T. Smith was its purchasing agent of property and that he had the authority to purchase or lease property for and on behalf of the defendant.

"3. That the defendant company employed the real-estate firm of McKeever & Goss, Inc., Washington, D. C., to act as its agent and to assist the said D. T. Smith in acquiring from the plaintiffs, their property located at the northeast corner of 4th and Massachusetts Ave., NE., for the defendant. That Stewart E. Godden and Guy S. Whiteford, employees of said firm were assigned to conduct the negotiations with the plaintiffs.

"4. From October 29, 1929, until April 21, 1930, the defendant company was negotiating with the plaintiffs, seeking to acquire the property. That on the 21st day of April 1930 a contract was entered into by and between the plaintiffs, and defendant whereby the defendant company agreed to lease and purchase said property upon the following terms and conditions: [Here follow the conditions of the contract.]

"That the description of the property and the terms and conditions of said sale and lease contract are set forth in a letter dated October 29, 1929, from the defendant company to the plaintiff J. W. White, the memorandum dated April 21, 1930, signed by the plaintiff J. D. White and the defendant's agent D. T. Smith and the letters of the defendant's agent Guy S. Whiteford to his principal and the plaintiff.

"5. On the 25th day of April 1930 the defendant sent one of its employees to the plaintiffs, to secure a more detailed description of the property. The company advised the plaintiffs that it desired to take possession of the premises within 30 days after April 21st, 1930. That pursuant to said contract and acts of the defendant company the plaintiff James F. White made preparations to retire from business and disposed of his stock in trade at greatly reduced prices. The motor livery business of the plaintiff which was a business of furnishing limousines and hearses to undertakers was disposed of and the plaintiff retired from that business.

"6. That the defendant company did not close said deal with the plaintiffs within the said 30-day period; that thereafter the defendant company requested of the plaintiffs a modification of the terms of the April 21, 1930, agreement which the plaintiffs declined to grant. That the plaintiff James F. White on or about the 1st of July 1930 made a personal call upon the president of the defendant company and insisted and demanded that the company carry out the terms of the contract of April 21, 1930, and that the said defendant company refused and declined to do so.

"7. The plaintiffs have, at all times, stood able, willing, and ready to carry out their agreement of April 21, 1930. The defendant has failed and refused to carry out its part of the agreement. That the agreement entered into between the plaintiffs and the defendant for the lease and purchase of said property was made within the actual or apparent scope of the authority of the defendant's agent; that said act of its agent was thereafter ratified and confirmed by the defendant company."

Appellant has assigned thirty-six grounds of error, but in the brief and in the argument the grounds relied on were condensed, and the points may be summarized as follows: That the memorandum of April 21, 1930, is not a valid contract because not enforceable under the statute of frauds and because it never was ratified by appellant, that it is void for want of mutuality, and that appellees failed to show they were ready, willing, and able to carry it out. Error is also assigned in the admission and rejection of evidence, but this assignment was not pressed, and we think it is without merit.

As a preliminary statement, we think it well to say we regard ourselves bound by the findings of fact made by the court below. Lawson v. Mining Co., 207 U. S. 1, 28 S. Ct. 15, 52 L. Ed. 65; Butte & Superior Co. v. Clark-Montana Co., 249 U. S. 12, 30, 39 S. Ct. 231, 63 L. Ed. 447.

The contract of April 21, 1930, was the result of negotiations carried out over a period of approximately six months. Appellant was apparently anxious to lease rather than purchase appellees' premises. Appellees, who are husband and wife, were unwilling to lease, but were willing to sell. Negotiations were begun October 29, 1929, and on that day one Wildman, appellant's Baltimore representative, whose territory included the District of Columbia, wrote a letter to appellee, White, stating he was interested in the lease of appellees' gas station at Fourth and Massachusetts Avenue Northeast, and would have a salesman call on him and obtain details of the property, business, etc. In the early part of January, 1930, Wildman came to Washington and brought with him Mr. D. T. Smith, and opened an office in the Raleigh Hotel. The purpose of his visit was to establish the Shell Oil Company in Washington, and the object was to acquire, either by lease or purchase, a number of gasoline stations then in operation. Mr. Guy S. Whiteford, a real estate agent living in Washington, had formerly had some correspondence with Wildman in relation to assisting him in this campaign, and, shortly after Wildman's arrival in Washington, Whiteford was sent for and thereafter continued to locate and assist in buying and leasing stations for appellant. While several of these transactions were in process, Smith, who was appellant's general purchasing agent in the campaign, asked Whiteford if he was familiar with appellees' gas station, and, when he replied he was, said: "I want that station, go and get it for me." As a result of these instructions, Whiteford reopened negotiations with appellee White, and thereafter Smith and White met several times. The matter was allowed, however, to drag, and, around the middle of February, Smith, who was then in Baltimore, again asked Whiteford about the matter, and Whiteford replied that appellees would not lease. Smith replied that he was ready to buy if White would pay Whiteford's commission. He explained this as necessary because he had sent a Mr. Edmonston to see White and was afraid he would have to pay two commissions unless Whiteford could get his pay from appellees. On April 21, the contract which we have set out above was signed at appellees' place of business. Whiteford was present. Prior to the signing there was considerable discussion as to terms. When these were agreed to, appellee White said to Smith: "Mr. Smith, if I say 'Yes,' it is a deal, is it? Can I depend on it?" Smith replied: "Absolutely, Mr. White." White then said: "I will make the deal." Smith replied: "You can consider your station sold." White requested that something be put in writing. Smith said: "I will write it down."

At the time the contract was signed White had a power of attorney from his wife, and Smith, as found by the court below, and we think correctly, was amply authorized to bind appellant.

Immediately after the contract was signed, Smith left for Baltimore, and at his request his coadjutor, Whiteford, wrote appellant's Washington attorney a letter inclosing a copy of the contract, describing the location of the property, and saying that further instructions would be forthcoming with relation to drawing the papers. Washington counsel some time thereafter prepared the formal contract, and this was sent to appellant's New York office, but was never returned. A day or two after the signing of the memorandum a representative of appellant named Lax came to appellees' gas station to check over the equipment of the station and to get an exact description of the property. Appellee (White) accompanied Lax to the office of the recorder of deeds, where Lax obtained the boundaries, etc., of the land. Some five or six days later another representative of appellant visted appellees with a contract (presumably the one prepared by counsel) which he asked appellees to sign. This representative of appellant stated to appellees, both of whom were present, that appellant wished to take possession of the premises within thirty days from April 21. Appellees, in order to comply with the contract and deliver possession at the end of the thirty days, immediately set about to accomplish the sale of the personal property not included in the contract. They advertised and gave notice generally of the fact of their retirement from business and of the purchase of the property by appellant. They sold, for what they would bring, their automobiles and hearses, which they had used to furnish undertakers for funerals and in which they had built up a profitable business. The gas business rapidly declined, their patrons made other connections, and at the expiration of the thirty-day period, or shortly thereafter, it had declined to less than 50 per cent. of normal.

After the thirty-day period had expired, a Mr. Foley, Smith's principal assistant, paid appellees a visit, apparently for the purpose of having them modify the contract by striking the provision requiring appellant to buy the property and making the purchase optional with it. This modification appellees declined to agree to, and some time thereafter appellant refused to carry out the contract.

The trial judge held the contract valid and enforceable. He thought the letter of October 29, 1929, should be read in connection with the memorandum of April 21, and that when so read supplied the omission in the memorandum of a description of the property. We think the question close, but with all the equities in favor of appellees. In these circumstances a court of equity ought not to declare the contract unenforceable if it can be properly sustained, and we think it can. That it was intended by the parties to supplement the memorandum by a formal agreement prepared by a lawyer does not affect its validity. As Mr. Justice Holmes said in Drummond v. Crane, 159 Mass. 577, 35 N. E. 90, 91, 23 L. R. A. 707, 38 Am. St. Rep. 460: "That is merely an additional wheel in the machinery."

The doubt as to the enforceability of the contract arises from the insufficiency of the written memorandum. It contains in itself, as we have seen, no description of the property to be sold, and, standing alone, obviously no court of equity could specifically enforce it, but, if the description is found in other writings forming part and parcel of the transaction, the omission is not fatal. This makes it necessary to examine the papers to which we have already referred. The letter of October 29, 1929, itself contained a definite reference to the location of the property. It was the commencement of negotiations between the parties, and it may be said to be the groundwork on which the contract was built. It was therefore admissible in evidence. But we think that stronger evidence than this in supplying the missing description in the memorandum of the contract is found in the letter written by Whiteford to appellant's counsel simultaneously with the signing of the contract. The writer of this letter testified that, in the course of three or four months during which the buying campaign was on, the universal practice was at the time of each purchase or lease to send the purchaser or lessor to the office of the same counsel to have the lease or purchase consummated. There can be no doubt, we think, that this letter of Whiteford's was written by him as agent of appellant in the usual and ordinary course followed by the company in closing contracts for lease or purchase of sites, and that in writing the letter he was acting within the scope of his authority and fulfilling his obligations to the company. Before the contract was finally repudiated, counsel, as we have seen, had sent to New York a tentative draft of agreement based on the memorandum and including a detailed description of the property.

It is, however, objected on behalf of appellant that Whiteford was not its agent be-

cause he was to receive his commissions from appellees, but there is, in the conditions we have shown in relation to this arrangement, nothing in the point.

Again, it is a fact that the description of the property is found in the proposed modification contract which appellant's admitted agent, Foley, brought to appellees and asked them to execute. That this latter paper and the others are all relevant and were all properly admitted in evidence we think is clear. All three identified the written memorandum of April 21, 1930, and there can be no question all related to the same subject-matter. In these circumstances they were in the same category as an exchange of correspondence between a prospective buyer and seller of land.

These facts bring the case within the doctrine announced in Ryan v. United States, 136 U. S. 68, 83, 10 S. Ct. 913, 918, 34 L. Ed. 447. There the Supreme Court pieced together numerous letters and telegrams, all referring to the same subject, in such a way as to make a completed and enforceable contract, and in doing so stated the rule as follows: "Did the papers which passed between the parties, constituting the memorandum of the transaction, contain such a description of the lands in dispute as was sufficient, in connection with extrinsic evidence not contradictory of nor adding to the written description, to meet the requirements of the Michigan statute of frauds? We say 'the papers,' because the principle is well established that a complete contract, binding under the statute of frauds, may be gathered from letters, writings, and telegrams between the parties relating to the subject-matter of the contract, and so connected with each other that they may be fairly said to constitute one paper relating to the contract."

If we are correct in thinking that the letter which opened the negotiations and which contained a sufficient description of the property and the contemporaneous letter of Whiteford which likewise contained a description of the property were properly admitted in evidence, and if we are also correct in holding, as we do, that in the transaction Whiteford was the representative of appellant, it is perfectly obvious the description absent in the memorandum itself is supplied in other papers, and, if we add to those we have mentioned the redraft of the contract made by counsel, the fact is even more manifest.

See further on the subject Beckwith v. Talbot, 95 U. S. 289, 24 L. Ed. 496, in which it was held that parol evidence was admissible to show the acceptance of a contract by one party and to identify the particular contract which the party had entered into. See also Woodruff Oil Co. v. Portsmouth Cotton Oil Corp. (C. C. A.) 246 F. 375, 378.

█ Nor do we think there is anything in the argument there was no ratification by the company of the contract. Ratification was unnecessary. Smith was the company's representative. He was authorized to act for appellant in the purchase of property. He had already purchased all of the property, consisting of from fifteen to twenty pieces which it then had acquired in Washington. It is quite true the president of the company testified he would give Smith a limit and Smith would then go out and purchase the property within that limit, but the limit was secret and was not known to the sellers, but Smith's right to buy was, for it had held him out to the public and to appellees as its representative and buyer, and the conclusion is irresistible that the later decision not to take the property was not because of lack of power in Smith to bind the company, but was the result of an afterthought which ought not to prevail. The times were changing rapidly, and a month or two after the signing of the memorandum it was obvious it was time to shorten sail.

█ Nor do we think there is anything in the point that the contract is void because of lack of mutuality. The point is made on the theory that, because the property belonged to the husband and wife jointly and the wife did not sign, she is not bound, and hence no suit for specific performance could be maintained against her. But the evidence shows that at the time White signed he held a power of attorney from his wife authorizing him to dispose of the property. This itself, we think, would have been a basis of suit by the purchaser against both for specific performance, but there is another and conclusive answer. It is this: After the contract was made, both appellees, as was found by the lower court, stood ready, willing, and able to perform the contract. The record is full of evidence showing this and also that they made every effort to have appellant perform. This of itself supplied the necessary mutuality.

In Verney v. Dodd, 96 N. J. Eq. 129, 125 A. 389, it was held that a contract for the sale of lands belonging to a husband and wife, but signed only by the husband, did not lack mutuality when, after the contract was made, a deed was executed by both and the

wife joined in a suit as party complainant for specific performance. And in Bride v. Reeves, 36 App. D. C. 476, we held that in circumstances such as this, that is to say, where both owners of the land join in a suit for specific performance, both thereby bring themselves within the obligation of the contract and completely under the power of the court. And in Robb v. Crawford, 56 App. D. C. 394, 16 F.(2d) 339, we held that, where the party signing the contract offered to prove that he was authorized by the other owner of the property to sign, there was mutuality at the time the contract was made; but we also said that, even if this were not the case, the better opinion now is that it is not essential that the mutuality of remedy shall exist at the inception of the contract, and that, even when the contract is originally lacking in mutuality, this element may be supplied by voluntary performance on the part of the party seeking specific performance. This, we think, completely disposes of the point, and we might very well rest our affirmance here, but there is another ground on which we should be compelled to affirm. It is that appellant is estopped from questioning the validity of the contract of April 21, 1930, by its acts in directing the plaintiffs to dispose of their business conducted on the premises agreed to be sold.

As we have shown in the statement of the facts, appellant, after the signing of the memorandum, called on appellees to prepare to make delivery of the property. It notified them that it would take over the property within thirty days, and that they must vacate by that time. Appellees acquiesced in this demand and made immediate preparations to this end. So far as the record shows, they were then enjoying a prosperous business, not only as a filling station, but also in connection with supplying automobiles and hearses for funerals. They had made a considerable investment on the latter account and had established a profitable business. When they received the notification that appellant would take over the gasoline business in thirty days, they had no other alternative than to sell the movable property at whatever price they could. They gave notice to customers that they had disposed of the business to the Shell Company, and many of their customers of long standing went elsewhere. The result was a loss of 50 per cent. of gas and oil business. They sold the automobiles and hearses at losses and gave notice to the trade that they were out of that business. In fact they prepared to retire and took all steps to this end so that at the

end of the time when delivery should have been made they had destroyed the good will of their business and put themselves in position without the machinery or equipment to carry it on. That this resulted directly from the contract and is directly and immediately traceable to it, there can be no particle of doubt. Nothing is shown to account for it otherwise. It is just as obvious as the placing of a building on land by one who has a contract to purchase. Not only was this a part performance of the contract, but its circumstances lead inevitably to the contract as the reason.

In Union Pacific Ry. v. McAlpine, 129 U. S. 305, 314, 98 S. Ct. 286, 289, 32 L. Ed. 673, the Supreme Court said: "A principle of common justice forbids that one shall be permitted to lead another to act upon a contract of purchase with him, and incur expenses, by reason of it, and then, upon some pretext of a defect in a matter of form, refuse compliance with its provisions, and thus deprive the purchaser of the benefit of his labor and expenditures. Courts of equity in such cases interfere and compel the vendor to keep his engagements." And again in Riggles v. Erney, 154 U. S. 244, 254, 14 S. Ct. 1083, 1086, 38 L. Ed. 976, the Court said: "Indeed, the rule is too well settled to require further citation of authorities that, if the parol agreement be clearly and satisfactorily proven, and the plaintiff, relying upon such agreement and the promise of the defendant to perform his part, has done acts in part performance of such agreement, to the knowledge of the defendant,—acts which have so altered the relations of the parties as to prevent their restoration to their former condition,—it would be a virtual fraud to allow the defendant to interpose the statute as a defense, and thus to secure to himself the benefit of what has been done in part performance." See, also, Pomeroy's Spec. Perf. of Conts. (3d Ed.) § 104.

The agreement to purchase appellees' gas station and property was the result of an organized campaign. It was on a through route of travel. Appellant's agent, Smith, put it on his list as a desirable acquisition for his company. He instructed Whiteford to commence negotiations, and these he himself later conducted to a conclusion on the date of the signing of the memorandum. He gave appellees the positive assurance that the property was sold, and a little later he sent an assistant to obtain an inventory of the property included under the terms of sale and to notify them that all else must be removed and the place turned over in thirty

days. In good faith they accepted the notice. In good faith they complied with it. The result was largely to destroy their business. The sequence of events was certain and complete. The refusal to carry out the contract was to leave them in a different and worse position from that in which they were when it was made. In such circumstances a court of equity will require the wrongdoer to abide his agreement.

For the reasons stated the decree below is affirmed.

Affirmed.

## On Motion for Reargument and Modification.

### PER CURIAM.

The court has considered the motion of appellant for a reargument of this appeal, and for a modification of the opinion and judgment entered herein on June 26, 1933.

The motion for a reargument is denied. The court, however, as part of its present judgment, hereby states its finding of the present status of the account between the parties, for the enforcement of the decree of the lower court as of this date. The court finds that the appellant, the Shell Eastern Petroleum Products, Inc., defendant below, is indebted to the appellees, plaintiffs below, as of this date as and for the annual rental of the property in question in the sum of $6,000 due and payable on May 21, 1930, together with interest thereon at the rate of 6 per centum per annum from that date to the date of payment; and also in the sum of $6,000 due and payable on May 21, 1931, as and for such annual rental, together with interest thereon from that date at the rate of 6 per centum per annum to the date of payment; also $6,000 due and payable as such annual rental on May 21, 1932, together with interest thereon from that date at the rate of 6 per centum per annum to the date of payment; also the sum of $6,000 from May 21, 1933, as and for such annual rental with interest thereon from that date at the rate of 6 per centum per annum to the date of payment; and also in the sum of $1,200 for taxes upon the real estate herein involved paid by appellees from May 21, 1930, to the present time; and that there shall be deducted from the aggregate of these items the sum of $5,231.97 which is found to be chargeable to the appellees in such account because of their continued occupancy and use of the premises in question from May 21, 1930, to the present time.

The court affirms each and all of the provisions of the final decree entered in this case on May 9, 1932, by the Supreme Court of the District of Columbia, including the provisions that the defendant company should, within ten days after the entry of the decree, deliver to the plaintiffs a lease and purchase agreement for the premises in question upon the terms and conditions that the defendant company should lease said premises for a period of eight years from and after May 21, 1930, at an annual rental of $6,000 per year, said rental to be paid yearly in advance (the sums thus made payable in the years 1930, 1931, 1932, and 1933 being the same as those above set out); that the defendant company should pay all taxes and insurance on said property, and should purchase the same within eight years after May 21, 1930, at the price of $100,000, by paying to the plaintiffs $50,000 in cash, and assuming the $50,000 mortgage to be placed upon said property; that the defendant company should, within ten days after the entry of the decree, procure a loan of $50,000 for the plaintiffs, at 6 per centum interest payable semiannually by the plaintiffs, secured by mortgage executed by plaintiffs upon said premises, said loan to extend over the period of the lease and to be assumed by the defendant company as above stated when the title should be conveyed by the plaintiffs to the defendant company; that the plaintiffs should surrender possession of the premises to the defendant company free and clear of incumbrance when the defendant company tendered the lease together with the $50,000 loan thereon as above provided.

It is hereby directed that a mandate issue herein to the lower court in due course together with a copy of the present finding and decision of this court.