BELL MCCAMPBELL HUFFINE *v.* JOSEPHINE MCCAMPBELL.*
*et al.*

(*Knoxville.* September Term, 1923.)

1. FRAUDS, STATUTE OF. Parol agreement concerning lands unenforceable when statute pleaded.

A parol agrement concerning lands is not void, but becomes unenforceable when the statute is pleaded. (*Post, p.* 59.)

Acts cited and construed: Acts 1801, ch. 25, sec. 1.

Cases cited and approved: Ryan v. United States, 136 U. S., 68; Brakefield v. Anderson, 87 Tenn., 206; Bailey v. Henry, 125 Tenn., 390.

Code cited and construed: Sec. 3142 (S.).

2. FRAUDS, STATUTE OF. Any number of connected papers may make memorandum satisfying Statute.

It is immaterial as to the number of papers which, connected together, make out the memorandum to be signed to satisfy the statute. (*Post, p.* 59.)

Case cited and approved: Hudson v. King, 49 Tenn., 560.

3. FRAUDS, STATUTE OF. Memorandum may be signed after transaction.

Memorandum to satisfy statute may be signed after the making of the contract whose enforcement is sought or resisted. (*Post, pp.* 59-78.)

---

*On written authorization of broker of agent to buy or see land as a memorandum of contract of sale to satisfy statute of frauds, see note in L. R. A. 1915C, 400.

On Statute of Frauds as affecting right to modify by subsequent parol agreement, a written contract required by the statute to be in writing, see note in 17 A. L. R. 10.

Huffine v. McCampbell.

Cases cited and approved:   Cash v. Clark, 61 Mo. App., 636;   Rose
v. Cunyingham, 11 Ves., 550;   Welford v. Beazley, 3 Atk., 503;
Seagood v. Meale, Pre. Cha., 560;   Sands v. Southern Ry. Co.,
108 Tenn., 1;   Wilson v. Winters 108 Tenn., 398;   Lowther v. Pot-
ter, (D. C.), 197 Fed., 196;   Wright v. Harrison & Black, 137
Tenn., 157;   Pipkin v. James, 20 Tenn., 325;   Adams, Trustee, v.
Scales, 60 Tenn., 337;   Lee v. Cherry, 85 Tenn., 707;   Neal v. Cox
& Talbert, Peck, 443;   Moore v. Ward, 71 W. Va., 393;   Lusky
v. Keiser, 128 Tenn., 705;   Blair v. Snodgrass, 33 Tenn., 1;   Drury
v. Young, 58 Md., 546;   Louisville Asphalt Varnish Co. v. Lorick,
29 S. C., 533;   Gibson v. Holland, L. R. 1 C. P., 1;   Buxton v.
Rust, L. R. 7 Ex., 1;   Allen v. Bennett, 3 Taunt., 169;   Tufts v.
Plymouth Gold Mining Co., 14 Allen, 407;   Argus Co. v. Albany,
55 N. Y., 495.

Cases cited and distinguished:   Hudson v. King, 49 Tenn., 560;
Barkworth v. Young, 4 Drewry, 1;   Drury v. Young, 58 Md., 546;

Charlton v. Columbia Real Estate Co., 67 N. J., Eq., 629;   In
re Hoyle, 1 Ch. 84;   Townsend v. Hargraves, 118 Mass., 325.

4. FRAUDS, STATUTE OF.   Statute is rule of evidence, and if not
pleaded parol contract can be enforced.

The statute is merely a rule declaring that a certain kind of evi-
dence is required to support an action in certain cases, and if not
pleaded a parol contract can be enforced.   (*Post, pp.* 78, 79.)

Cases cited and approved:   Hudson v. King 49 Tenn., 560;   Davis
v. Ross, 50 S. W., 650.

Case cited and distinguished:   Lee v. Cherry, 85 Tenn., 707.

5. FRAUDS, STATUTE OF.   Complainant's voluntary deposition held
usable against her as memorandum to supply deficiencies in original
memorandum of contract within statue.

Where, after partition of land was begun, complainant offered in
letter signed by her attorney in her presence to deed her share
to defendants for a named sum, which offer was accepted, but
later repudiated such offer and refused to sign deed, and de-

Huffine v. McCampbell.

fendants then sought in same proceeding specific performance of compromise agreement, complainant contending that the letter was not a sufficient memorandum to satisfy the statute, *held*, that complainant's voluntary deposition, in which she recognized and identified the letter, could be used as a memorandum under the statute to supply any deficiencies in the letter, though complainant's name was signed to the deposition by the reporter, and the complainant attempted in the deposition to repudiate the contract of sale. (*Post, pp.* 79, 80.)

---

## FROM KNOX.

---

Appeal from the Chancery Court of Knox County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—HON. CHAS. HAYS BROWN, Chancellor.

WRIGHT, JONES & SAXTON, STEINMETZ & MITCHELL and A. C. GRIMM, for Mrs. Huffine.

CATES, SMITH & TATE, for Josephine McCampbell and others.

MR. MALONE, Special Judge, delivered the opinion of the Court.

While several questions are discussed in the briefs of counsel and in the opinion of the court of civil appeals, the determinative question here is whether a certain compromise agreement is enforceable under the statute of frauds, and, more particularly, the effect of a deposition voluntarily given by a litigant, and its possible use as a memorandum to satisfy the fourth section of the statute of frauds.

This section of the statute of frauds, as embodied in Acts 1801, chapter 25, section 1 (Shannon's Code, section 3142), contains the following provision with regard to sales of land:

"No action shall be brought: Whereby to charge . . . any person . . . upon any contract for the sale of lands, tenements, or hereditaments, . . . unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorized."

The parties chiefly concerned in this matter the three sisters, Miss Josephine, Miss Bell, and Miss Lena McCampbell, who lived near Knoxville on a small farm of some twenty-six acres, in which (as well as in certain other real estate) they held undivided interests.

Miss Bell McCampbell married W. G. Huffine. Her sisters thought him "no account" (to use their own phrase), and refused to let him live on the place. This caused an estrangement between the sisters, Mrs. Huffine and husband being arrayed on the one side against Misses Josephine and Lena McCampbell on the other.

After some effort to make a division of the twenty-six acre property, a bill was filed by Mrs. Huffine, in her own name, against her sisters, alleging that complainant and defendants were tenants in common of the twenty-six acre farm, each owning an undivided one-third interest; that the three sisters were also joint owners of the crops being raised on the premises (including certain hay, potatoes, onions, and other produce), and in like manner owned two mules, two wagons, and certain other agricultural

Huffine v. McCampbell.

machinery, their ownership in said property being one-third each; that complainant believed the real estate capable of being advantageously partitioned in kind. The prayer was that the rights of the parties be declared; that the real estate be partitioned, and the personalty divided; and that, if such partition and division were impracticable or inadvisable, the land be sold, and the proceeds divided.

To this pleading the defendants filed a long answer and cross-bill, in which they claimed that, on account of various transactions, fully set forth, the interest of the complainant was not one-third in all of the twenty-six acres, but in a part thereof was only one-fourth; that she was not entitled to a one-third interest in the crops on this portion of the land, but only to a one-fourth interest; that the real estate could not be advantageously partitioned in kind, and that it was to the manifest interest of the parties that the same be sold, and the proceeds divided. The prayer was in accordance with the averments of the bill.

To this answer and cross-bill the original complainant filed an answer, reiterating the claims set forth in her original bill, and insisting that, if the court should find that the property was not susceptible of partition in kind, a sale should be had under the original bill, and not under the cross-bill.

On these pleadings an order of reference was made by the chancellor to ascertain whether the premises were so situated that just partition could be made; the interests of the parties in the property, real, and personal; whether it was to the interest of the parties that the property be sold instead of divided.

Pending these proceedings in the partition suit, the parties entered into negotiations for a settlement, through the purchase of the interest of the complainant, Mrs. Huffine, in the property described in the partition proceedings, and also her interest in a small tract of some four acres, not involved in the pending litigation.

At this time Gen. Charles T. Cates was the solicitor for Misses Josephine and Lena McCampbell, and Mr. K. E. Steinmetz was the solicitor for Mrs. Huffine, in the partition suit.  By authority of his clients, General Cates made an oral proposition of settlement, which was accepted by Mrs. Huffine by her solicitor, Mr. Steinmetz, in the following letter:

"Steinmetz & Mitchell, Lawyers,
"Suite 228-229 Mechanics' Bank Building,
Knoxville, Tennessee.
"September 27, 1919.

"Chas. T. Cates, Esq., Empire Bldg., City—Dear Sir: Mrs. W. G. Huffine accepts the proposition you communicated to me by telephone yesterday on behalf of Lena and Josephine McCampbell, and which I have this afternoon for the first time been able to submit to Mrs. Huffine.

"That proposition is: That Lena and Josephine McCampbell will pay Mrs. Huffine three thousand nine hundred fifty ($3,950) dollars for all her interest in the tract of land involved in the partition proceedings pending in the Knox county chancery court between these parties, and for her one-fourth undivided interest in the tract on the north side of the Straw Plains pike containing less than five acres; that complainant and respondents will pay the costs accrued on their respective behalves in said proceedings and, that Mrs. Huffine will dismiss her partition

bill and execute the necessary conveyances to effect the compromise.

"Yours very truly,

"K. E. STEINMETZ."

The record shows, without contradiction, that Mrs. Huffine was present in the office of her counsel Mr. Steinmetz, when this letter was written, and authorized him to write it. She and Mr. Steinmetz both so testify.

This letter was received by Gen. Cates on Monday morning, September 29, 1919, and during the day his client, Miss Lena McCampbell, brought to his office the original deeds covering the property therein mentioned, and on the same day he prepared a deed in conformity with the proposition and the acceptance, and sent this to Mr. Steinmetz either that afternoon or the next morning. On Tuesday, September 30, 1919, Mrs. Huffine and her husband went to the residence of Miss Lena and Miss Josephine, on the home place (the husband not entering the house), and Mrs. Huffine told her sisters that she would not execute the deed because $3,950 was not enough for the property.

This was communicated to Gen. Cates, and he telephoned Mr. Steinmetz on October 1, 1919 (without, however, disclosing the conversation that had taken place between the sisters at the residence on the previous day), and strongly urged him to have his client sign the deed. There is some disagreement as to one part of this conversation. Mr. Steinmetz understood Gen. Cates to say that unless the deed was executed by 12 o'clock on October 2d the $3,950 offer would be withdrawn, and he made a memorandum to this effect at the time. Gen. Cates says if Mr. Stein-

metz so understood him (and he does not question his good faith in the matter) this was an error, as he had no authority from his clients to withdraw the proposition. His clients support him in this statement. It is, perhaps, of no great importance to settle this issue; but it would seem probable that Mr. Steinmetz misunderstood Gen. Cates. The proposition made by Gen. Cates had been definitely accepted, and it is difficult to see what legal right he had to "withdraw" it, even if he had been authorized by his clients to do this. *Ryan* v. *United States,* 136 U. S., 68, 86, 10 Sup. Ct., 913, 34 L. Ed., 447.

Mr. Steinmetz tried to communicate with his client, and, finding her away from home, left a note in her apartment, requesting her to come to see him as soon as possible. Early the next morning (October 2, 1919) she and her husband came to the office of Mr. Steinmetz, and he at once notified them of his understanding of the telephone conversation with Gen. Cates. They thereupon told him, as he testifies, that "they had changed their minds about accepting the offer; that Mr. Huffine had talked it over with Mrs. Huffine, and they did not think the offer was satisfactory, and they did not sign the deed." While it is suggested, on behalf of Mrs. Huffine, that she was justified in refusing to sign the deed because it conveyed her interest in the personalty, and thus varied from Mr. Steinmetz's letter of acceptance, there seems to be no doubt that Mr. Steinmetz is correct in his statement, and that Mrs. Huffine had definitely determined not to sign the deed before she ever came to the office. In fact, she did not read the deed, although it was there ready for inspection, and in the opinion of her counsel conformed to the

proposition of her sisters, which had been accepted by her. Mr. Steinmetz says that, while neither of them saw or read the deed, "they knew what was in the deed, and that the deed was drawn in conformity, as I understood. I had advised them that we had the deed in our office, and it was the deed following the proposition that had been accepted in my letter of September 27th. . . ."

After the refusal of Mrs. Huffine to sign the deed had been communicated to her sisters, certain other compromise negotiations took place between them, Mr. Steinmetz taking the precaution to have his client personally sign the propositions submitted by her. In these negotiations it was distinctly stated by Gen. Cates that his clients insisted on the validity of the compromise settlement already made, and that the negotiations were without prejudice to their rights in this behalf. This took place during the month of October, 1919, but the parties were unable to reach an agreement.

Nothing was done for a period of several weeks, and until December 10, 1919, when certain depositions were taken under the order of reference, on behalf of the complainant, Mrs. Huffine, at the office of her counsel, Mr. Steinmetz. Two real estate men gave their opinions as to the value of the property, etc., and the complainant also gave her deposition. On her cross-examination it was brought out that she did authorize her counsel, Mr. Steinmetz, to write the letter of September 27, 1919, and the identity of the two tracts of land therein mentioned (the twenty-six acre home place and the four acre lot on the Straw Plains pike) was definitely established. To this deposition her name was signed by the reporter, in con-

formity with an agreement of counsel set out in the caption. Thereafter, in January, 1920, Misses Lena and Josephine McCampbell filed a supplemental cross-bill, in the nature of an original bill, against the complainant, Mrs. Huffine, setting forth the compromise agreement and the steps taken in the partition proceeding, including the taking of testimony, and the deposition given by Mrs. Huffine ratifying the authority of her counsel in writing the letter, and identifying the lands covered by the agreement.

The prayer of this supplemental cross-bill was for a specific performance of the compromise agreement.

To this cross-bill Mrs. Huffine filed an answer setting up various defenses, and especially relying upon the statute of frauds. This answer was filed by other counsel, Mr. Steinmetz having, apparently, withdrawn from the case.

Thereupon a large volume of proof was taken in the case, making a record wholly disproportionate to the amount and issues involved. Much feeling seemed to exist, and a considerable amount of contradictory testimony was introduced—a regrettable condition very frequently to be observed in family disputes.

The chancellor, on the hearing, sustained the contentions of the defendants Misses Lena and Josephine McCampbell, under their amended cross-bill, and decreed a specific performance of the compromise agreement. The purchase price of $3,950 was paid into the registry of the court, and the decree directed that, after deducting therefrom the costs adjudged against the complainant, Mrs. Huffine, the balance should be paid to her solicitor.

From this decree she appealed to the court of civil appeals, which court in all things affirmed the decree of the chancellor, being of opinion:

(a) That the compromise agreement was not void or voidable under the statute of frauds.

(b) That, even if the statute did apply, the contract should be upheld as a family settlement.

The complainant, Mrs. Huffine, has brought the case to this court upon *certiorari,* and complains of the opinion and decree of the court of civil appeals.

1. It is claimed, on behalf of the petitioner, that there was a discrepancy between the deed prepared by Gen. Cates and the compromise agreement, in that the compromise agreement, as shown by the letter of Mr. Steinmetz, did not include personal property. It is doubtful, upon this record, whether Mrs. Huffine had any considerable interest in the personal property, unless it be her interest in the crops. But the original bill, as has been pointed out, specifically called for a division of the personal effects, including the crops; and the letter of Mr. Steinmetz, referring to the proceedings, was, we think, intended to cover all matters in litigation under the partition proceedings. Certainly it was understood that litigation was to cease, for all costs were to be paid, and the bill dismissed. Moreover, as has been pointed out, Mr. Steinmetz understood, and so advised his client, that the deed, calling for a conveyance of the personalty, conformed to the compromise agreement.

From what has been said, it is evident that petitioner's contentions (a) that the minds of the parties never met, and (b) that she was justified in refusing to sign the deed, because of a variance, are without substance, if, in fact, she is not precluded from advancing them in this court, in view of certain concurrent findings of the chancellor

and court of civil appeals. The same may be said of her claim that the proposition was withdrawn before acceptance.

2. The contention on which she places her chief reliance, and which is debated with research and ability in the briefs of counsel, concerns the statute of frauds.

No serious insistence is advanced by petitioner's counsel that the description of the twenty-six acre home place is not sufficient. But it is strongly contended that the description of the other tract, viz. "her one-fourth undivided interest in the tract on the North side of the Straw Plains pike, containing less than five acres," fails to satisfy the requirements of a sufficient memorandum under the statute of frauds; and since the memorandum as to this tract is insufficient, it is contended that the whole contract is unenforceable, whether it be divisible or indivisible. Williston on Contracts, section 532.

On behalf of her sisters, the respondents, it is contended: (a) That the reference to "her undivided one-fourth," etc., in the Steinmetz letter, is sufficient to admit parol evidence; and (b) that if the Steinmetz letter is not a sufficient memorandum, the deposition voluntarily given by Huffine under the order of reference, prior to the filing of the cross-bill for specific performance, when taken in connection with the letter, satisfies all of the requirements of the statute.

Assuming, as we shall, without deciding, that the first insistence is untenable, it appears that the ultimate contention, advanced on the one side, and denied to the other, concerns the sufficiency of the deposition as a memorandum under the statute of frauds.

3. The question appears to be of first impression in this State.

It is of course, well settled that a parole agreement concerning lands is not void, but becomes unenforceable when the statute of frauds is pleaded. *Brakefield* v. *Anderson,* 87 Tenn., 206, 208, 209, 10 S. W., 360; *Bailey* v. *Henry,* 125 Tenn., 390, 400, 401, 143 S. W., 1124.

And it is "immaterial" "as to the number of papers which, connected together, make out the memorandum . . ." *Hudson* v. *King,* 2 Heisk., 560, 573.

It is equally well settled that the memorandum may be executed after the transaction.

"It may be executed any time after the contract and before the action. It is doubted whether it might not be after the action brought, because the statute only means to secure written evidence of the contract." *Hudson* v. *King,* 2 Heisk., 560, 573.

4. Before proceeding to examine the legal question immediately involved, it seems advisable to consider more particularly the language of the deposition.

The original examination of the complainant, Mrs. Huffine, was taken by her counsel, Mr. Steinmetz, and deals with the value of the land involved, etc.

On cross-examination she was asked about the matters covered in her original examination, and it was further developed that Mr. Steinmetz had been representing her in this litigation, and the letter of September 27th was exhibited to and identified by her, and filed as Exhibit A to her deposition. Her examination with regard to this letter, and also with regard to the deed which was tendered to her for execution, is as follows:

"Q. That is Mr. Steinmetz's signature to this letter? A. Yes, sir; and I knew that he wrote you that letter, but I had a perfect right if I felt like it to go back on that without any injury to my case.

"Q. Wait a minute. Will you file this paper as Exhibit A to your deposition? A. I so file it. (Exhibit A.)

"Q. Mr. Steinmetz wrote that letter for and on your behalf? A. All right.

"Q. The Charles T. Cates mentioned in this letter is one of the solicitors for the defendants, is he not? A. Yes.

"Q. Now pursuant to that letter Exhibit A to your deposition, a deed was prepared to be executed by you conveying the interests in the properties referrd to in that letter Exhibit A to your two sisters for the sum of $3,950, was there not? A. A deed prepared?

"Q. Yes; and turned over to Mr. Steinmetz, and he submitted it to you, and you would not execute it? A. That is right.

"Q. I will ask you if you have in your possession now the original of that deed? A. No.

"Q. Now, Mr. Steinmetz has furnished you the original deed which was prepared to be executed by you for your interests in the property in controversy in this cause and in the two lots referred to in this Exhibit A to your deposition as being on the north side of Straw Plains pike, has he not; he furnished you that original, did he not? A. Yes.

"Q. Since you have been testifying here? A. Yes.

"Q. Please file that as Exhibit B to your deposition? A. I so file it. (Exhibit B.)

Huffine v. McCampbell.

"Q.  Now, Mrs. Huffine, I ask you do you still refuse to execute that deed?  A.  I do.

"Q.  I want to state to you that I am now here in position and ready to tender you $3,950 in cash, the consideration referred to in Exhibit A to this letter and referred to in that deed, and ask you if you will accept it and execute that conveyance?  A.  I will not.

"Q.  Mrs. Huffine, your full name is Belle McCampbell Huffine, is it not?  A.  Yes, sir.

"Q.  And you are the Mrs. W. G. Huffine who is referred to in this Exhibit A to your deposition?  A.  Yes, sir."

On re-direct examination she was questioned by her counsel, Mr. Steinmetz, as follows:

"Q.  Do you recollect how much time intervened the writing and the sending of the letter signed by K. E. Steinmetz dated September 27, 1919, made Exhibit A to your deposition, and the receipt of this deed sent to you which is made Exhibit B to your deposition; how long was it from the time I sent this letter until I handed you this or told you about it?  A.  I do not remember.

"Q.  State whether or not you had a personal interview with one of the defendants after the letter made Exhibit A to your deposition was written and before you were advised by K. E. Steinmetz that he had received from Gen. Cates the deed made Exhibit B to your deposition.  A. Yes.  I met Lena up here at Kuhlman's drug store and asked her what about the deed, where they had offered me $3,950, and she says, 'I never heard'—she said she had never heard of such a thing, and didn't know there was such a thing.  I said, 'Didn't you tell Gen. Cates to send such a deed,' and she said 'No.'

Huffine v. McCampbell.

"Q. Did she then at that decline to execute such a deed? A. Yes.

"Q. And say she would not do it? A. Yes; she said she would not give me that."

On recross-examination she was asked and answered as follows:

"Q. Mrs. Huffine, the parcel of land referred to in Mr. Steinmetz's letter to Mr. Cates under date of September 27th, Exhibit A to your deposition, as being on the north side of the Straw Plains pike containing less than five acres, is the same one that is specifically described in the first paragraph of the description of the deed which is filed as Exhibit B to your deposition, is it not? Look over that paragraph and see? A. Yes."

Can this deposition stand, in connection with the papers exhibited, as a sufficient memorandum?

5. The only case which we have found dealing with the question of the sufficiency of a deposition as a memorandum is the case of *Cash* v. *Clark*, (1895), 61 Mo. App., 636.

In that case, the plaintiff brought suit on a contract for the sale of personal property which fell within the Missouri statute of frauds, and the defendant interposed a plea of the statute of frauds. Thereupon the plaintiff subpœnaed the defendant to give a deposition, made him give a deposition, proving the terms of the contract, and sign and swear to the same before a notary public.

He then dismissed the first suit, and brought another suit on the contract, and relied on the defendant's deposition as a memorandum under the statute of frauds.

The court of appeals of Missouri, in a well-considered

opinion, while recognizing that it was "much easier to come to a conclusion against plaintiff's case than to give a logical reason therefor," held that a deposition thus coerced from the defendant did not constitute a proper or sufficient memorandum.   In discussing this question, it was said:

"Plaintiff's contention is that, consistently with the foregoing, the deposition of the party to be charged is a sufficient memorandum.   With the qualification that it be a voluntary deposition, we concede the proposition.   For it must be remembered that the statute was not enacted for the purpose of permitting a person to avoid a contract. The object was not to grant a privilege to a person to refuse to perform what he has agreed to perform.   It was not enacted with a view of furnishing a shield to the dishonest, though, as an incident, it sometimes has that effect, by reason of the generality of its application.   It was enacted to prevent fraud and perjury, thereby preventing fraudulent claims to be enforced against innocent parties by perjury.   The act of parliament statute, 29 Car., has the preamble: 'For prevention of many fraudulent practices, which are commonly endeavored to be upheld by perjury and subornation of perjury; be it enacted,' that a contract for the sale of personal property shall not be allowed to be good, unless, etc.   The writing is, therefore, the only legal evidence of the contract, and, if we have the defendant's own writing, establishing the contract, especially when that writing is in the form of a sworn statement, all fear of a fraudulent contract being fastened upon him by perjury is at an end, and the purpose of the statute has been literally fulfilled.   By keeping con-

stantly in mind that it was not the primary object of the statute to confer a personal privilege upon a party, to enable him, at his pleasure, to become recreant to his agreement (though, as before stated, it can be used in that way), but was rather to prevent others from forcing a spurious contract upon him by false swearing; it becomes apparent that, whenever the party himself puts the terms of the contract in writing, the full purpose of the statute has been subserved.

"These reflections make it clear enough to our mind that a deposition, voluntarily given by a party to a contract (even though taken, as this was, in a case on the contract), may be used by the opposite party to defeat a plea of the statute."

It is further said: "Under what conditions a deposition taken in some foreign or collateral case, in which the contract was stated, would be considered as a voluntary statement of the contract, need not be considered at this time.

"By the case which plaintiff presents to us, we understand it to be conceded that the defendant was subpoenaed, and was, of course, by that means, required to give his deposition. In this deposition, plaintiff had him state the terms of the contract, in answer to questions propounded by plaintiff. This, we think, was not a voluntary statement of the contract in writing and ought not to be received as taking the case out of the statute. This is not altogether from its not being voluntary, in the strict sense, for it is, partly, but from an interpretation of the law as applicable to a deposition and the statute of frauds.

"When a party to a cause is subpoenaed to testify by

deposition, he is required by law to do so. He is required to state the truth. It will not do to say that the testimony was incompetent, since the contract was verbal and therefore need not have been given; for, besides the fact that the defendant, as a witness, would, perhaps, not be allowed to make that objection before a notary, there are many instances in which verbal contracts are enforced, and it becomes necessary to state them; such as, when there has been part payment, part performance and the like. It must, therefore, be conceded that the law requires his deposition to be given when called for.

"The law likewise enacts that he may plead the statute, when called to answer to a verbal contract. Since, then, the law requires him to give his deposition, when called upon, and since the law permits him to plead the statute in an action against him founded on a verbal contract, the two legal propositions ought to be interpreted in harmony and so that one may be carried out in practice without nullifying the other.

"To do this, we must allow the statute full effect, notwithstanding the defendant may have stated the contract in a deposition required and taken by the opposite party. Otherwise, the statute could practically be set at naught in perhaps the greater number of cases where it has commonly been applied."

Referring to the analogy of a sworn answer, it is said in the opinion:

"The suggestion may be made that in the case of an answer, admitting the contract, the statute was specially saved; while in the deposition, there is no reservation.

But a deposition is not the place where the defendant could make a plea of the statute, if he would."

The court further says: "Another thought suggested by the known object and purpose of the statute is this:

"A party, who is compelled to give his deposition, realizing that his admission of a verbal contract will deprive him of the plea of the statute, will be put to great temptation to commit perjury in order to escape the fatal consequences to his defense, resulting from such admission. Thus the purpose of the statute, if construed in harmony with the plaintiff's contention, would not be fully accomplished."

This is a well-reasoned case, and was, as it seems to us, correctly decided. We fully concur in the view that to receive a statement extorted from the witness who has been forced to testify would defeat his right to rely on the statute of frauds as a defense, and would prove so strong an incentive to perjury on his part as to be forbidden by public policy.

6. Somewhat resembling the case of. *Cash* v. *Clark,* supra, is the English case of *Barkworth* v. *Young* (1856), 4 Drewry, 1, where an affidavit of the party to be charged, made in another litigation, was relied on as a memorandum.

The Vice Chancellor, Sir Richard Torin KINDERSLEY, discussing this point, says:

"The defendant next objects that, assuming that a proper memorandum or note in writing made after the marriage would be sufficient, this affidavit of the testator is in no sense a note or memorandum of the alleged agreement; that it was not made with any such intent, but only

Huffine v. McCampbell.

to rectify a statement made by the present plaintiff as to what the testator had said on the occasion of the marriage; that it was made in the course of a litigation between the testator and the plaintiff, totally unconnected with the contract or promise now alleged by the plaintiff; and that it was merely put upon the files of the court without having been delivered or sent to the plaintiff or to any other person.

"Now to determine this point it is necessary to consider what was the object of the statute of frauds, at least of the fourth section. Its object was to prevent the mischief arising from resorting to oral evidence to prove the existence and the terms of an alleged verbal agreement in certain specified cases, and among the rest an agreement made in consideration of marriage, it having been found that in actions and suits to enforce such agreements they were (in the language of the preamble) "commonly endeavored to be upheld by perjury and subornation of perjury." It is obvious that there can be no ground to apprehend any such mischief in any case in which you have, under the hand of the party sought to be charged, a written statement of the agreement which he made and of all its terms, and for this purpose it can signify nothing what is the nature or character of the document containing such written statement, provided it be signed by the party sought to be charged; whether it was a letter written by that party to the person with whom he contracted or to any other person, or a deed or other legal instrument, or an answer to a bill, or an affidavit in chancery or in bankruptcy or in lunacy. Thus, where a verbal agreement was made for the sale of land, a letter written by the vendor or purchaser to his own solicitor or agent stating the terms

of the agreement, and not intended for the inspection of the other party, has been held to be a sufficient note or memorandum within the intent of the statute. *Rose* v. *Cunyngham,* 11 Ves., 550, *Welford* v. *Beazeley,* 3 Atk., 503, per Lord HARDWICKE. So a letter written by the vendor to his mortgagee. *Seagood* v. *Meale,* Pre. Cha., 560. In *Welford* v. *Beazeley,* 3 Atk., 503, the defendant, previously to the marriage of plaintiff with her daughter, had verbally agreed to give her a marriage portion of £1,000. Articles were executed settling the £1,000. Defendant was not a party to the articles, but signed them as a witness knowing their contents. This was held a sufficient note or memorandum within the intent of the statute. Now in that case the defendant, in attesting the articles, had no intention of giving a note or memorandum in writing. But Lord HARDWICKE said: 'The meaning of the statute is to reduce contracts to a certainty, in order to avoid perjury on the one hand and fraud on the other, and, therefore, both in this court and in the courts of common law, where an agreement has been reduced to such a certainty, and the substance of the statute has been complied with in the material part, the forms have never been insisted upon.' I may here add that it is no doubt on the same principle that, if a bill is filed to enforce a verbal agreement, and the defendant by his answer simply admits it without insisting on the statute by the answer, the court will decree performance, notwithstanding that the defendant, at the hearing, insists on the benefit of the statute, because you have here all that it was the design of the statute to require—a statement of the terms of the agreement in writing signed by the defendants. Indeed, form-

erly, this court went so far as to hold (though the decisions have been since properly overruled) that, if the answer contained an admission of the parol agreement, though accompanied by a protest insisting on the statute, the plaintiffs should have a decree. I think the principle of all these cases is applicable to the present. We have a writing signed by the testator, stating the fact and the terms of the prior parol agreement or promise; and that is what is required by the intent of the statute. Indeed it is impossible not to feel that there seems even more justice in binding a person by such a statement of the agreement as is contained in this affidavit, which is prepared with all caution and deliberation, and which, in addition to the party's signature, is stamped with the solemnity of his oath, and which was intended to be perused by the party with whom the contract was made, then by a mere letter addressed to her own solicitor or mortgagee, written perhaps hastily and carelessly, and never intended to come to the knowledge of the other party.

"I am of opinion that the statement in the affidavit of the testator, set out in paragraph 7 of the bill, is a sufficient note or memorandum in writing within the intent of the statute."

This is also a well-considered case; and its discussion of the question of "intention" hereinafter considered is especially valuable.

7. Was the deposition voluntary?

Mrs. Huffine was not compelled to give this deposition; and certainly she was not forced to testify by the opposite party. When she submitted herself for direct examination, under the English rule of cross-examination prevail-

ing in this State (*Sands* v. *Southern Ry. Co.*, 108 Tenn., 1, 9, 64 S. W., 478), opposing counsel were permitted to cross-examine her about any competent and relevant matter, without making her their witness. It is further to be noted that her own counsel, on redirect examination, went into the same matter, and sought to show by her that she was excused for her repudiation of the contract by the fact that her sisters had first repudiated it. No objection was made by her counsel on the ground that the agreement was unenforceable under the statute of frauds, if, indeed, such an objection would have afforded protection.

8. It may, perhaps, be suggested that a deposition, though voluntarily given, could not be used as a memorandum because it is not delivered.

In the case of *Wilson* v. *Winters* (1901), 108 Tenn., 398, 402, 67 S. W., 800, a deed was made out in proper form, and signed by the grantor. The grantee desired that the grantor's wife should join in the execution of the instrument. She was then ill, and the grantor retained the deed, saying that on her recovery they would both sign and acknowledge it. No objection was made by the grantee, and the deed was deposited by the grantor in his safe, where it was found after his death. Upon its discovery the grantor's wife signed and acknowledged it, and delivered it to the grantee.

The evidence showed that the grantor and grantee considered the contract complete, and that the grantee regarded himself as absolute owner of the land.

The grantor's heirs having brought suit for the land, it was held by this court:

(a) That the deed was inoperative for want of delivery.

(b) That the contract of sale did not conform to the statute of frauds, because the memorandum was never delivered—the court saying, at page 402 of 108 Tenn., at page 801 of 67 S. W.:

"But the instrument is equally ineffectual as a memorandum in writing to answer the requirements of the statute of frauds. It was intended by the parties to it as a deed, and not as a mere memorandum of a contract of sale, and, being inoperative, for want of delivery as a deed, it cannot be made to perform service as a mere memorandum. In this view, the text-writers and the courts, which have had occasion to rule upon this question, with a single exception, so far as our examination has extended, concur."

The cases cited and reviewed by this court in this opinion are all concerned with deeds inoperative for want of delivery. The language used as to delivery must be read in the light of this fact, and, when so read, and restricted to the case of an undelivered deed, the opinion is in line with the weight of authority. *Lowther* v. *Potter* (D. C.), 197 Fed., 196, 204.

But it was not intended to decide that there could be no valid memorandum under the statute of frauds in the absence of delivery. It has, for example, been said, both in previous and subsequent cases, that a proper entry made by an auctioneer of real estate on his book is a sufficient memorandum under the fourth section of the statute of frauds. *Wright* v. *Harrison & Black* (1916), 137 Tenn., 157, 161, 192 S. W., 716; *Pipkin* v. *James*, 1

Humph., 325, 327, 34 Am. Dec., 652; *Adams, Trustee,* v. *Scales,* 1 Baxt., 337, 340, 25 Am. Rep. 772.

And in *Lee* v. *Cherry,* 85 Tenn., 707, 4 S. W., 835, 4 Am. St. Rep., 800, this court held, in an opinion written by Mr. Justice LURTON, that correspondence between the owner and his real estate broker might constitute a memorandum.

It may be noted, also, that the case of *Wilson* v. *Winters* makes no reference to the opinion of Judge McKINNEY in the early case of *Neal* v. *Cox & Talbert* (1824), Peck, 443, where the court seems to hold that delivery is not essential, saying, after quoting this section of the statute:

"Now, observe, the statute does not say that the writing shall be given by the person to be charged therewith, to the person who seeks to enforce the contract."

Not only does the statute contain no such requirement, but, as pointedly observed by the supreme court of Maryland in the case of *Drury* v. *Young* (1882), 58 Md., 546, 42 Am. Rep., 343, 344:

"If produced from the defendant's own custody, it [the memorandum] guards against the mischief that the statute was passed to prevent, just as well as if produced from the custody of the plaintiff. The plaintiff is the one likely to suffer by leaving the evidence of his bargain in the hands of the defendant—not the defendant himself."

It would also appear to be true that the case of *Neal* v. *Cox & Talbert,* supra, is more in line with modern authorities than *Wilson* v. *Winters,* unless the decision in that case be restricted to undelivered deeds. In the case note to *Charlton* v. *Columbia Real Estate Co.* (1905), 67

Huffine v. McCampbell.

N. J. Eq., 629, 60 Atl., 192, 69 L. R. A., 394, 110 Am. St. Rep., 495, as reported in 3 Ann. Cas., 405, it is said, after citing certain cases which hold delivery of the memorandum to be necessary:

"Both on principle and according to the weight of authority, however, it would seem that delivery of a memorandum of a verbal agreement, otherwise sufficient to satisfy the statute, is not essential to its validity and binding force and effect"—citing numerous authorities.

And see the decisions on this point collected in the case note to *Moore* v. *Ward* (1912), 71 W. Va., 393, 76 S. E., 807, 43 L. R. A. (N. S.), 390, as reported in Ann. Cas., 1914C, p. 263.

It is, indeed, probable that the case of an undelivered deed is *sui generis*.

As pointed out by Judge Cochran, in *Lowther* v. *Potter* (D. C. E. D. Ky., 1912), 197 Fed., 196, the mere fact that a deed has been prepared by the vendor does not necessarily mean that the contract has been completed. "It may mean no more than a willingness and purpose to convey on the terms stated therein."

But (says the court) if such an undelivered deed "contains a recital that it is made in pursuance to a previous contract of sale," this would take the case out of the statute.

It was accordingly held, in a learned opinion, that, while ordinarily a memorandum need not be delivered, an undeivered deed which did not recite the existence of the contract was insufficient.

9.  Must there be an intention that the writing stand as a memorandum.

In the case of *Wilson* v. *Winters,* supra, the court as will be noted says, with respect to the undelivered deed:

"It was intended by the parties to it as a deed, and not as a mere memorandum of a contract of sale. . . ."

In the early case of *Pipkin* v. *James,* supra (1839), it appeared that the plaintiff and another had purchased from defendant a quantity of groceries and an icehouse and lot, and that a third person, at the request of both parties, wrote an invoice or memorandum of the different articles purchased, which was headed with the following words:

"Invoice of articles purchased by S. Pipkin and R. Oliver of Wm. R. James, this 29th August, 1836."

Among other items in the invoice was the following:

"One icehouse and lot, $140.00."

It being contended that this entry was a sufficient memorandum the court said at page 327 of 1 Humph. (34 Am. Dec. 652):

"We do not think so; because, in the first place, it is proven that the inventory was not intended by the parties as a note or memorandum of the contract, but merely as a statement of the amount of the different articles purchased, with the view of ascertaining the aggregate sum for which the notes were to be executed; and because, secondly, if it were intended as a note or memorandum of the contract it is void for uncertainty, both as to the terms of the contract and the description of the property."

In the case of *Lusky* v. *Keiser,* 128 Tenn., 705, 164 S. W., 777, L. R. A., 1915C, 400, it was held that, where the owners of land executed to a real estate broker written authority to sell a specifically described lot on definite

terms, and incorporated an agreement to make a deed to any good purchaser procured by the broker, and the purchaser wrote thereon the words, "I hereby accept the proposition," and signed the same, this writing did not constitute a sufficient memorandum under the fourth section of the statute of frauds. The court held that this instrument "was one whose function and end was to define in contract form the relationship" between the vendors and their agent.

The decision of this case, however, seems to have been placed on the ground that "there was no existent oral contract" between the parties at the date of the instrument which could have been evidenced by the contract of agency, which was relied on as a memorandum.

It may be noted that the authorities are not at all in accord on the question as to whether there must be an intention to make a memorandum evidencing the contract. The reasoning of the court in *Barkworth* v. *Young,* supra, will be recalled. And in the case of *In re Hoyle* (1893), 1 Ch., 84, where a statement made in a will was held to constitute a sufficient memorandum, it was said in the opinion of Sir A. L. Smith, Lord Justice:

"A letter to a third party has been held enough; an affidavit made in a different matter has been held to suffice; and I should say that an entry in a man's own diary, if it were signed by him and the contents were sufficient, would do. The question is not what is the intention of the person signing the memorandum, but is one of fact, viz. is there a note or memorandum of the promise signed by the party to be charged? Here the testator by his will, which he signs, recites the guaranty sued on.

The contents of the statement are sufficient; and why is this not a memorandum in writing signed by the party to be charged? I say that it is."

It would further seem that to apply the rule of intention strictly would overrule the leading case of *Lee* v. *Cherry*, cited with approval in *Lusky* v. *Keiser* (1913), supra, for the correspondence between the vendor and his broker was certainly not intended to make a memorandum binding the vendor under the statute of frauds.

10. But, conceding the fullest weight to previous decisions of this court on the questions of delivery and of intention, we think these authorities do not control the present case, because there was in this case a letter written by the duly authorized agent of the vendor, and delivered to the vendee, which was intended for the very purpose of a memorandum.

The question then arises whether this writing, intended as a memorandum, and delivered as a memorandum, can be connected with another writing signed by the party to be charged, to-wit, her deposition given under the circumstances above shown. It is well settled in this State (as it seems to be everywhere) that two or more writings of the party to be charged, affording intrinsic proof of their connection, may serve as a sufficient memorandum; and even letters passing between the vendor and his agent, which refer to and connect with each other, and contain all the terms of the sale and a sufficient description of the property, may constitute a good memorandum. *Lee* v. *Cherry*, 85 Tenn., 707, 709, 4 S. W., 835, 4 Am. St. Rep., 800; *Blair* v. *Snodgrass*, 1 Sneed, 1, 25; *Lusky* v. *Keiser*, 128 Tenn., 705, 709, 164 S. W., 777, L. R. A., 1915C, 400.

It is therefore difficult to see why the deposition of a party, voluntarily given upon his solemn oath, should stand on any lower basis than any other writing. Barkworth v. *Young*, 4 Drewry, 1, 15.

The purpose of the statute was to prevent fraudulent contracts, with regard to real estate, from being set up by perjured evidence. In the present case no evidence of any third party was required or received. The original memorandum was duly executed and delivered by the authorized agent as a formal memorandum. The deposition of the party to be charged (voluntarily given) under examination of her own counsel, as well as under examination of opposing counsel, refers to the formal memorandum and to the deed describing the land covered by the memorandum.

As stated in the case of *Cash* v. *Clark*, supra;

"If we have the defendant's own writing, establishing the contract, especially when that writing is in the form of a sworn statement, all fear of a fraudulent contract being fastened upon him by perjury is at an end, and the purpose of the statute has been literally fulfilled."

It was, as the court further said in that case, the object of the statute "to prevent others from forcing a spurious contract upon him by false swearing," not to afford him a convenient method of repudiating his agreement.

11. Would the attempted repudiation of the contract in the deposition affect the question?

If the first answer of the cross-defendant on her cross-examination hereinbefore quoted, can be construed to be a present claim that the contract was invalid, and that she was not bound by its terms, it does not follow that

such a repudiation in a deposition voluntarily given would destroy the availability of the writing as a memorandum, for it seems to have been held in numerous cases that a letter written for the express purpose of repudiating the parol contract may constitute a sufficient memorandum. *Drury* v. *Young,* 58 Md., 546, 42 Am. Rep., 343, and note; *Louisville Asphalt Varnish Co.* v. *Lorick* (1888), 29 S. C., 533, 8 S. E., 8, 2 L. R. A., 212, and note.

In *Townsend* v. *Hargraves,* 118 Mass., 325, 335, a case involving the seventeenth section, it is said:

"The memorandum is sufficient if it be only a letter written by the party to his own agent; or an entry or record in his own book; or even if it contain an express repudiation of the contract. And this because it is evidence of, but does not go to make, the contract. *Gibson* v. *Holland,* L. R. 1 C. P., 1; *Buxton* v. *Rust,* L. R. 7 Ex., 1, 279; *Allen* v. *Bennet,* 3 Taunt., 169; *Tufts* v. *Plymouth. Gold Mining Co.,* 14 Allen, 407; *Argus Co.* v. *Albany,* 55 N. Y., 495, 14 Am. Rep., 296."

The statute of frauds is, after all, merely a statute declaring that a certain kind of evidence is required to support an action in certain cases. If the statute be not pleaded, a parol contract can be enforced. The distinction between the contract itself and the memorandum, which is merely the evidence thereof, is clearly shown in *Lee* v. *Cherry,* 85 Tenn., 707, at page 708, 4 S. W., at page 835 (4 Am St. Rep., 800), where the court says:

"It is not essential that the contract of sale shall be in writing, provided there is produced a writing containing the terms of the oral contract, and authenticated by the signature of the party to be charged."

Huffine v. McCampbell.

If, for example, a vendor should write the vendee a letter, in substance as follows:

"I am aware that I made an oral contract to sell you my farm on these terms [setting them out], but this is to notify you that I decline to carry out this trade."

no reason is perceived why this written declaration would not sufficiently evidence the parol contract. His letter would stand as a written admission that such a contract was made; and his declaration that he intended to repudiate the contract thus made could neither add to nor substract from the evidentiary value of the letter. To take a contrary view is, as it seems to us, to confound the contract itself with the memorandum required by the statute of frauds.

Another consideration which clearly shows the distinction between the contract and the memorandum is the fact that the memorandum may be made long after the contract. *Hudson* v. *King,* 2 Heisk., 560, 573.

We may add that the case of *Davis* v. *Ross,* 50 S. W., 650, 654 (Court Ch. App., Nov. 11, 1898, affirmed orally Nov. 15, 1898), where the allegations of a bill for rescission were relied on as constituting a memorandum, in no wise conflicts with the views above expressed, for in that case the bill expressly pleaded and relied on the statute of frauds.

12. Without, therefore, deciding that a deposition may be used as a sufficient memorandum, either standing alone or in connection with other writings, under other circumstances, we hold that under the circumstances shown in this particular case the original memorandum, taken to-

gether with the deposition of the party to be charged, is sufficient to satisfy the statute of frauds.

As this is the only debatable question in the case, it results that the decrees of the chancellor and of the court of civil appeals will be affirmed.