SOUTHERNMOST MARINE SER-
VICES, INC., a Florida corporation,
d/b/a Sea Tow Key West, Key West
Harbor Service, Inc., a Florida corpo-
ration, and Denhart Marine Consul-
tants, Inc., a Florida corporation,
Plaintiffs,

v.

ONE (1) 2000 FIFTY FOUR FOOT (54')
SEA RAY named M/V "POTEN-
TIAL," her engines, tender, tackle,
equipment, furnishings, and appurte-
nances, in rem, and Jeffrey Keierleber,
her owner, and Northern Insurance
Company of New York, her Insurer, in
personam, Defendants.

No. 02–10022–CIV–KING.

United States District Court,
S.D. Florida.

March 13, 2003.

James Perry, II, Miami, FL, for Plaintiff.

Christopher Fertig, Ft Lauderdale, FL, for Defendant.

### MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, Senior District Judge.

In predawn darkness, the M/V "Potential" cast off its moorings and glided away from the marina dock on its last voyage. After proceeding out of Key West Harbor, with its owner at the helm, it crashed into a rock jetty while underway at 18 knots sustaining severe damage to its haul. It commenced to sink, rapidly filling with sea water, oil and fuel from the 600 gallons of diesel fuel loaded aboard prior to departure. It came to rest, impaled on the massive rock of the jetty and hard

aground, 54 feet into the jetty from the point of crash.

Plaintiffs, professional and licensed salvors operating out of Key West, Florida responded to the owner's cry for help, rescued the three passengers aboard the sinking vessel, returned them safely to shore and saved the endangered ship from the battering it was receiving as waves pounded against it.

At substantial personal risk, divers from the Plaintiff's salvage company performed underwater salvage operations, successfully removing the M/V "Potential" from the rock jetty and towing it to a Key West boatyard to be hauled and secured.

The owner's insurance company paid the total $750,000 claim of the owner and assigned an experienced marine surveyor as their representative to travel to Key West to negotiate a settlement of the salvage award with Plaintiffs. After inspections and negotiations, the salvers and Defendant's marine surveyor agreed to $150,000 as full payment of the salvage claim.

Northern Insurance Company, acting on their agent's recommendation of settlement and pursuant to the agreement, issued a check to the Plaintiff salvers for $150,000 and forwarded it via overnight mail to the salvor's Key West address. After the check had been placed in the mail, and after discussion with a lawyer, Northern Insurance Company canceled payment on the check, removed the vessel from Key West, Florida to another marina at Ft. Lauderdale and refused to pay salvors the agreed amount.

This suit in admiralty seeking a reasonable award of salvage for the services rendered the M/V "Potential" then ensued.

## I. *FINDINGS OF FACT*

The parties have stipulated to the following uncontested facts:

Plaintiffs, Southernmost Marine Services, Inc., d/b/a Sea Tow Key West, and Key West Harbor Service, Inc., are professional salvors and operate as such in Key West, Florida.

Defendant, Jeffrey Keierleber, was the owner of the M/V "Potential" on November 11, 2001. Defendant, Northern Insurance Company of New York issued a policy of insurance to the owner(s) of the M/V "Potential," insuring its hull, machinery, tender, tackle, equipment, furnishings, appurtenances and contents and said policy of insurance was in full force and effect on November 13, 2001.

The Plaintiffs were successful in their efforts to salve the M/V "Potential."

By the Amended Answer, Affirmative Defenses and Counterclaim for Breach and Recision, Defendants conceded "the Plaintiffs in this action responded and successfully salved the stranded vessel. As a consequence, the salvors are entitled to a low order salvage award."

The pivotal issue is then, what is the proper amount of salvage award and damages due the Plaintiff?

Addressing this issue, Defendants contend for a low salvage award predicated upon factual assertions (a) that the salvors failed to property preserve and protect the vessel while in its possession; (b) that the risk to salvors and vessel was insubstantial; (c) that there was no pollution to the environment. Two additional claims suggesting intimidation to the marine surveyor appointed by the insurance company to represent the interest of the vessel and overreaching by the salvors through the filing of inflated claims were basically abandoned by defense at the trial of this case and/or were so frivolous as to want no further comment or resolution by the Court. Suffice it to say the Court finds total failure on the part of the Defendant

to carry its burden of proving either of these suggested affirmative defenses.

The Court, adopting the foregoing description of the events of November 11, 2001, when the M/V "Potential" struck and grounded herself upon the rock jetty, as findings of fact by the Court, now makes the following factual findings based upon the sworn testimony and evidence presented during the non-jury trial of this case in November 2002:

Plaintiffs, Southernmost Marine Services, Inc., d/b/a Sea Tow Key West, Key West Harbor Service, Inc. and Denhart Marine Consultants, Inc., are professional salvors and operate as such in Key West, Florida.

Defendant, Jeffrey Keierleber, was the owner of the M/V "Potential," a 2000 54–foot Sea Ray Dancer, on November 11, 2001. He had purchased the vessel new, one year before for $750,000.

Defendant, Northern Insurance Company of New York issued a policy of insurance to the owner(s) of the M/V "Potential," insuring its hull, machinery, tender, tackle, equipment, furnishings, appurtenances and contents on an agreed value basis of 3/4 million dollars. The policy of insurance was in full force and effect on November 11, 2001, through November 13, 2001.

On November 11, 2001, Plaintiff, Sea Tow Key West, responded to a marine assistance request broadcast (MARB) from U.S. Coast Guard Group Key West and located the M/V "Potential" hard aground on a rock jetty.

Aboard the M/V "Potential" were the owner, Jeffrey Keierleber, and three (3) passengers.

The vessel had suffered severe damage to its hull and was in danger of sinking and of further damage from wave action and tides moving the boat impaled on the rock jetty. There were holes in the hull and

her running gear and rudders were destroyed.

The main cabin of the vessel was filled with approximately four (4) feet of sea water, oil and fuel and was in peril on the date of the salvage operations. The engine compartment was completely under the ocean and filled with sea water and oil. The salvors were able to place an absorbent boom surrounding the engine compartment and contain the oil spill to the interior of the engine room.

The owner Defendant, Jeffrey Keierleber read and signed a salvage contract, presented to him by members of the Plaintiff/Salvage team prior to their commencing salvage and prior to his leaving to return to Key West. The owner and his passengers were advised to remove any of their personal property and valuables that they wished to secure before leaving the boat since there was substantial likelihood of loss of such items if the boat sank. Mr. Keierleber and his guests accumulated their valuable personal items and took them with them when they left the boat.

The Plaintiff/Salvors then took the owner and passengers of the M/V "Potential" and transported them safety back to Key West, Florida where they immediately departed Key West and flew home.

Since the boat was located at this point in the boundaries of the Key West National Marine Refuge, the salvors had a great concern about environmental damage. The United States Coast Guard had been contacted and was at the scene. Balanced as it was, at high tide, on the sharp coral rocks of the jetty, the fuel tanks could have ruptured through the movement of the ocean tides, spilling the 600 gallons of fuel aboard into the marine sanctuary.

"Reef" Mark Perkins, one of Plaintiff's salvors, testified concerning the installation by the salvors of an oil boom to soak

up the oil spills and fuel, the attachment of heavy duty lift bags underneath the hull of the vessel and the unsuccessful attempts to start the "locked-up" engines.

Since the boat could not be backed off the reef due to the inoperable engines, an attempt was made to haul it off physically through the use of the salvage vessels on the scene. During this period of the salvage operation, the water was pouring into the holes of the bottom of the boat and the sea water came up to deck level. It was determined it could not be repaired at sea and would have to be patched underwater, continuously pumped and placed under slow towage back to Key West.

Three large patches were fixed to the haul of the M/V "Potential" with the divers working both underwater and inside the vessel's engine room. This was dangerous work with the possibility of asphyxiation by carbon monoxide poisoning (in the engine room) and with the wave action threatening to roll the boat over on the divers crushing them against the jetty. The current was swift through the channel and the salvors worked under dangerous conditions.

A large 90–foot long steel hulled tugboat came down the channel, observed the situation and after discussions with the salvors assisted in pulling the M/V "Potential" off its hard aground position. Time was of the essence due to the changing tides.

The divers worked from dawn until 2:00 a.m. on the 11th and then again until 4:00 p.m. on November 12th conducting salvage efforts described herein.

The salvors, Southernmost Marine Services, Inc., d/b/a Sea Tow Key West, Key West Harbor Service, Inc. and Denhart Marine Consultants, Inc., were able to remove the owner and passengers of the M/V "Potential," together with all their personal valuables and transport them safely back to Key West on the 11th.

The following day the Plaintiff/Salvors after successfully removing the M/V "Potential" off the rock jetty and sand bar towed the vessel to Spencer's Boatyard in Key West, Florida, where the vessel was immediately hauled out of the water and secured on blocks. During the salvage and tow to Key West many items floated off the boat. The crew picked up and saved what they could. During the slow three-hour tow (necessitated by the almost submerged condition of the salvaged boat under tow) a route to Spencer's Boatyard was taken so as to not cross the main shipping channel thus running the risk of blockage of the channel.

Immediately upon arrival between 6:00 and 7:00 p.m. on the 12th, expert mechanics from R & R Diesel were hired by the salvors to clean and preserve the engines of the M/V "Potential." The mechanics from R & R and the cleanup crew employed by salvors worked all night to accomplish these tasks.

The expert mechanic, Mr. Gordon Freispetit from R & R Diesel, was instructed by the salvors to get the engines ready to run, cleaned and free of all the damaging effects of the submerging saltwater. There was a concern about his personal safety, from oil and diesel fumes in the cramped space of the engine room where he had to work.

The experts from R & R Diesel were successful in cleaning and preserving the engines of the M/V "Potential" and were able to start the engine and turn it over in the presence of the insurance company marine surveyor hired by the Defendant Northern Insurance Company when he arrived on the 13th of November 2001. The testimony reflects and the Court so finds that the "engines were good." Mr. Sanislo (Defendant's marine surveyor) testified that he was impressed with how profes-

sionally the Plaintiffs had done the work of cleaning and preserving the boat.

The salvage of the M/V "Potential" was successful in removing the vessel from its condition of peril and restoring the engines to working condition before "pickling" them.

When the owner arrived back in Key West from his home on Tuesday, the 13th he observed salvor "Reef" Perkins and Stephen James Sanislo (Defendant's marine surveyor) at Spencer's Boatyard, in discussions while the mechanic, Mr. Freispetit, was working on the engines on his boat. After identifying himself, the owner was given the personal belongings that the salvors had been able to clean and place in black plastic bags in the master stateroom and underneath the boat.

The owner, Mr. Keierleber remarked about how really clean the boat was and proceeded to take possession of such items as he wished from the plastic bags that were stored on the boat. Other plastic bags of items that had been spoiled with the seawater over not salvageable had been placed in a dumpster at the boatyard. After looking through the dumpster the owner did not keep any of the items.

Mr. Keierleber did not complain to Perkins or Sanislo about "missing or stolen" items. He did not have much to say other than to remark upon the cleanliness of the boat and from all appearances was not only not upset but was in a friendly, cordial mood to the insurance company marine surveyor and the salvor. He told Sanislo he wanted the boat "totaled,"— declared a complete loss.

Mr. Stephen James Sanislo of C & J Marine Surveyors Inc. testified that he received a call from Mr. Bruce Trant of the Defendant Northern Insurance Company of New York, who employed him with the statement "I have a 3/4 of a million dollar vessel on the rocks in Key West—it might be a total loss and I want you to

handle it." Mr. Sanislo left on November 12, 2001, and proceeded from his home on the east coast of Florida, to Key West and Spencer's Boatyard to inspect the vessel. He met with Plaintiff/Salvor Mr. Perkins the following day and after a thorough inspection, both inside and outside the vessel, concluded that the bottom was in "bad shape," the main cabin was in "pretty good shape" and although the water had reached to higher level in the cabin it was in "good shape." He was impressed with the cleanliness of the boat and the professional job the salvors had done.

Mr. Sanislo told Mr. Perkins that he wanted to see the condition of the engines and he wanted the "engines rolled over." There was a problem since the electrical controls that start the engine had been soaked with salt water so that other electronic controls had to be substituted in order to get the engines up and running. This was done and they got the engines started and running.

Mr. Gordon Freispetit, the expert mechanic from R & R Diesel, who had been employed by the salvors to put to the engines into running order testified that there was an oil film saturating everything in the engine room. It was a very tight, difficult place within which to work and his work continued over a ten to twenty-day period. During this time he cleaned thoroughly the carburetor and took the engine apart so that it could be flushed out with diesel, cleaned thoroughly, oiled and "spin the engines over to make sure they operated well." He testified this was necessary in order to dry the water out of other portions of the engine. The gears were broken.

After cleaning the engine thoroughly, he reassembled it, filled it with oil. He then described how the engine is controlled through a "computer brain" which had been ruined by virtue of having been un-

derwater when it wrecked on the reef. The computer brain is in an electric box that had been damaged to the point that it could not be fixed. The mechanic brought in two batteries and manually "spinned over" the engine.

Mr. Freispetit faxed the insurance company on December 12, 2001, with inquiries about what they wanted to do about purchasing or replacing the computer brain that runs the engines. Without the computer to run and maintain the engines, it could not be operated on a permanent basis.

The Defendant insurance company advised him that the company did not want him to purchase and install a new "computer brain" because they were going to move the boat soon to another boatyard.

The Court finds, based on his testimony, that the electric and gear systems were broken, but that if those two items had been repaired, the engine could have been operated on a permanent basis.

The Court further finds that the engine was running when the mechanic finished his work to the extent that it was able to be cranked over in the presence of the marine surveyor, Mr. Sanislo. The Court finds that the salvors did, with respect to the care of the boat and the engines fulfill their responsibility to salvage them as completely and quickly as was possible under the circumstances.

The parties stipulated and the Court so finds that a number of items the owner originally suggested might be missing were preserved and returned to him through the second marine surveyor retained by the Defendant insurance company, Mr. Wendling (Pl.'s Exh. 21 and Testimony of Chris Dirienzo). Mr. Sanislo testified there was nothing missing from the M/V "Potential" when he inspected the vessel on November 13, 2001, and the photographs taken by the insurance company surveyor show that the electronic gear, stereo, speakers (and other items of that sort) were physically in place on the boat, in the boatyard as of November 14, 2001.

By the 20th, when Mr. Wendling arrived, some stereo speakers and other electronic items were missing. This occurred between the 14th, when possession of the boat had been turned over to the Defendants and the 20th when Wendling arrived.

After Mr. Sanislo had made his inspection and satisfied himself as to the condition of the boat, he and Mr. Perkins entered into negotiations regarding the amount to be paid to salvors for their service. The Plaintiffs wanted $200,000 provided negotiations could be conducted with Mr. Sanislo without having to deal directing with the Defendant insurance company.

While all of this was going on in Key West, events were transpiring back at the headquarters of the Defendant Northern Insurance Company of New York that had a direct bearing on the company's knowledge and approval of the steps their marine surveyor/agent Mr. Stephen James Sanislo was conducting as their representative.

The videotape deposition of Mr. Neil Saleh, taken October 25, 2002, was introduced into evidence at the trial. Mr. Saleh testified, as an employee and an experienced marine insurance agent of the Defendant insurance company that he had been assigned the insurance claim that had been filed by the boat owner, Mr. Keierleber and told by his supervisor, Mr. Bruce Trant to contact the owner (Keierleber), appoint a marine surveyor (Sanislo) to proceed to Key West to handle the evaluation of damages, and be the company's representative to supervise on behalf of the insurance company the ongoing activities of Mr. Sanislo in Key West. After speaking

to the boat owner, Mr. Keierleber who made clear his desire that the insurance company "total" the boat and pay him in full the face amount of the insurance policy, Mr. Saleh selected Mr. Stephen James Sanislo as the marine surveyor and representative of the Defendant insurance company. Mr. Sanislo had previously been selected by the Defendant insurance company and was on the list of their approved marine surveyors for Florida. He was selected and dispatched by Mr. Saleh to Key West.

In his position, as point contact person from the Defendant insurance company and supervisor of the claim, Mr. Saleh testified that Mr. Sanislo called him to advise the company of the progress of his on-site inspection and further that, ". . . the salvors wanted $200,000 and that he was going to have lunch with Mr. Reef Perkins to see if he can get the $200,000 salvage demand lowered." Mr. Saleh testified that he did not give Sanislo any instructions since "he had no authority to do so." Mr. Sanislo testified he was given authorization to negotiate and, given the undisputed testimony that Mr. Sanislo proceeded to go to lunch with Mr. Perkins and negotiate the amount downward, the Court finds this testimony of Mr. Saleh not believable.

Mr. Saleh then testified that he told his boss, Mr. Trant about the conversation with Mr. Sanislo (where the salvors where demanding $200,000) and that "Mr. Trant had no comment when told that Mr. Sanislo intended to negotiate the claim downward." When specifically asked in his video deposition if Mr. Trant made any comments back to Mr. Saleh about Mr. Perkins seeking $200,000, the answer was "not that I can recall." The Court finds this testimony not believable. This specific area of inquiry of Mr. Saleh occurred at pages 42 and 46 of the written deposition of the video deposition taken October 25, 2002. In each instance, Mr. Saleh, while admitting that he had relayed the conversations he was having with Mr. Sanislo to Mr. Trant, again stated "I can't recall that Mr. Trant offered any comments about what was going on in Key West." Mr. Saleh's testimony had the effect of leaving the impression that Mr. Trant, his boss, did not give him any authority to permit Mr. Sanislo to go ahead and negotiate with Mr. Perkins and the salvors. As indicated above, this testimony is not believable, given what was actually ongoing in Key West at the time, where Mr. Sanislo was able to negotiate the salvage demand from $200,000 down to $150,000. The Defendant insurance company accepts, without question, the lunch meeting, the negotiations and the lesser settlement amount of $150,000.

Further in Mr. Saleh's testimony concerning his knowledge of events ongoing in Key West, he testified that he knew that Mr. Sanislo had in fact ultimately achieved a reduction of the $200,000 down to $150,000 and that a $150,000 check was cut by the company for payment of this agreed upon salvage award. Although evasive about observing or knowing that Mr. Trant was the person who actually signed the $150,000 check, he testified that he knew that it was cut by Defendant and mailed out to the salvors in payment of the agreed upon salvage claim. Again, the Court reluctantly finds that Mr. Saleh was not truthful and forthcoming about knowing that Mr. Trant had fully approved of this settlement agreement for $150,000.

Saleh said he did not know why Mr. Sanislo was relieved from working on the insurance file any longer, to be replaced by Mr. Bob Wendling. He had been told by the boat owner, Mr. Keierleber that some of his personal items were missing from the boat and suspected they had been stolen. This turned out to be inaccurate since

the parties ultimately stipulated that all "missing items" were preserved and turned over to either Sanislo or Mr. Wendling (company replacement for Sanislo), who gave them to the owner Keierleber (Plaintiff's Exhibit 21), except for some electronic items missing after Defendants took possession of the boat and left it in Spencer's Boatyard.

The Court finds that Mr. Saleh and Mr. Trant gave the marine surveyor authority to negotiate with Reef Perkins to see if he could get the salvors to agree to a lower settlement figure.

While Mr. Sanislo was in Key West, he received several phone calls inquiring about purchase of the M/V "Potential." One caller offered to purchase it "as is, where is" for $300,000. The information about these telephone inquiries were related to the insurance company representatives.

After final checking with the insurance company, settlement agreement was reached on a salvage amount of $150,000, with the payment to the boatyard of $3,500 and to the mechanics of $3,800 included. Mr. Sanislo advised Mr. Perkins "we have a deal." The check would be paid in ten days and Mr. Sanislo asked Mr. Perkins to write a letter that he would read and approve for transmittal to the company.

On behalf of the Plaintiff/Salvors, Mr. Reef Perkins prepared a letter to the Defendant Northern Insurance Company, confirming the agreement between the salvors and Northern Insurance. After Mr. Sanislo proofread the letter and approved it as being a correct statement of the agreement he had entered into with the salvors on behalf of the Defendant insurance company, Mr. Perkins faxed and mailed the letter to the Defendant insurance company on November 14, 2001.

Mr. Saleh received the faxed letter, took it to his boss, Mr. Bruce Trant and a discussion ensued in Defendant's office, between Saleh, Trant and Elizabeth Delagey (claims agents for Northern Insurance supervising this claim). These company representatives approved the settlement, cut a check for $150,000 as the agreement payment to the salvors and mailed it to the salvors in Key West via overnight mail.

At this point, November 14, 2001, Mr. Stephen James Sanislo, acting as agent and representative of the Defendant Northern Insurance Company of New York, assumed control of the M/V "Potential" in the Key West boatyard, together with responsibility for payment of the yard bill after November 14th. The stereo speakers (and other electronic items) were apparently taken after the 14th. Pictures introduced in evidence show them in place as of the 14th, but missing as of the 20th. This is the responsibility of the Defendants and the boatyard.

The Court finds that this was a completed contract by the marine surveyor employed by the Defendant insurance company, with full authority to act on their behalf. He was held out to Mr. Perkins and the salvors as having full authority to act for Defendants and Plaintiffs entered into this agreement with full reliance thereon, reducing the original claim for their services by $50,000.

Approximately two days later, Defendant, Northern Insurance Company, decided to back out of the deal and informed the Plaintiff/Salvors that the settlement check was not negotiable, and to return the check, upon receipt.

Two or three days after the settlement had been agreed upon, Plaintiffs received a call from Mr. Sanislo advising them that he had been relieved from further responsibility by the insurance company and was "off the case." Mr. Bob Wendling next contacted the Plaintiff/Salvors and announced that "I am here representing the insurance company as the replacement ma-

rine surveyor." Mr. Perkins showed him the boat where it was stored in the boatyard. Mr. Wendling testified that he arrived in Key West on November 20, 2001, five or six days after the salvage vessel had been delivered over to the custody of the Defendant insurance company on November 14, 2001.

R & R Diesel had been instructed by a representative of the Defendant, Northern Insurance Company of New York, not to do anything further on the boat or engines because the vessel was going to be moved from Key West, Florida. At this point in time both engines of the M/V "Potential" were preserved, manually and electrically "turned," and were run-able. The engines and generator of the M/V "Potential" were "pickled" and preserved. Mr. Wendling satisfied himself that the R & R Diesel bill and the Spencer's Boatyard bill were each fair, reasonable and accurate and authorized full payment by the Defendant insurance company.

Mr. Wendling made arrangement for the M/V "Potential" to be towed from Key West to the Marine Max in Ft. Lauderdale where it was sold to Bent Boats for $174,219.40.

The salvage services rendered by the Plaintiff/Salvors resulted in the subject vessel being successfully removed from the marine peril to which it was subject.

The owner of the M/V "Potential" accepted the salvage services rendered by the Plaintiff/Salvors.

The Plaintiff/Salvors freely and voluntarily rendered salvage services and held no preexisting duty or obligation to do so.

The Plaintiff/Salvors by virtue of having voluntarily and successfully delivered the subject vessel out of its marine peril, is entitled to a liberal salvage award which is based upon a percentage of the post-salvage, pre-repair value of the subject vessel and which takes into consideration the risk posed to the subject vessel; the promptitude, the skill and efficiency of the salvors; the labor and time expended by the salvors; the value of the materials employed by the salvors and the nature of the risk to which these materials were exposed; and the skill, efficiency, and effort of the salvors in preventing or mitigating damage to the environment as a result of the incident herein.

The Court finds that the actual cash value of the M/V "Potential" prior to the accident was $750,000 and that this amount was paid in full by the Defendant insurance company to the owner Mr. Keierleber. The estimates of value, as given in sworn testimony during the trial of this case by Mr. Sanislo and Mr. Perkins, both of whom are experienced in salvage operations and marine surveying, giving an opinion that the vessel's value was $400,000 to $450,000, is credible. The Court therefore finds that the post-salvage, pre-repair value of the M/V "Potential" is $400,000.

It should be noted that several parties expressed an interest in purchasing the M/V "Potential" after it had been delivered to Spencer's Boatyard in Key West. Mr. Sanislo received six calls in one afternoon regarding purchasing the boat for its salvage value. He testified that he received one telephone offer of $300,000 and was negotiating for a sales price of approximately $350,000 at the time he was removed from the case.

That Defendant, Northern Insurance Company of New York, benefitted from the salvage of the M/V "Potential" and is pecuniarily liable for any loss of or damage to the vessel.

Although the Plaintiff/Salvors have made demand for said salvage award, no payment has been made for these services. The salvors retained the services of attor-

neys and are obligated to pay them a reasonable fee for their services.

## II. *CONCLUSIONS OF LAW*

This is an Admiralty and Maritime claim within the meaning of Rule 9(h) and Supplemental Admiralty Rule C of the Federal Rules of Civil Procedure. This Court has original jurisdiction over this matter based upon 28 U.S.C. § 1333.

### A. *SALVAGE CLAIM*

■ The Court holds, first, that Plaintiffs are entitled to a salvage award for the recovery of the M/V "Potential." The three elements of a salvage claim are:

(1) that marine peril exists;

(2) that the service was voluntarily rendered; and

(3) that the effort was successful in whole or in part.

*Cobb Coin Co., Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 549 F.Supp. 540, 557 (S.D.Fla.1982); *Klein v. Unidentified Wrecked and Abandoned Sailing Vessel,* 758 F.2d 1511, 1515 (11th Cir.1985); *The Clarita,* 90 U.S. (23 Wall.) 1, 16, 23 L.Ed.2d 146 (1874).

■ It is well established in this Circuit that a marine peril exists where a vessel is in danger of being partially or totally lost through the action of the elements and where it is not being successfully salved when the plaintiff voluntarily undertakes its salvage operation. Because the M/V "Potential" was in peril of sinking and breaking apart if it had been simply pulled off its impaled position on the massive rock of the East Jetty to the Northwest Channel leading to the Key West Harbor, without the prior affixing of substantial floatation gear, it was subject to "marine peril" for purposes of the Plaintiff's salvage claim. No contest is made by Defendants over the fact that the vessel was in peril and that salvage efforts were not being done by anyone at the time of the arrival of the Plaintiff's salvage boats.

The Plaintiffs have satisfied the second and third elements of a salvage claim as well. There is no dispute that the Plaintiffs voluntarily rendered the salvage service and are entitled to a salvage award. The Plaintiffs were under no preexisting duty to save the vessel or its passengers. Further, the findings of fact entered above by this Court clearly demonstrate that the Plaintiffs successfully saved a vessel, of substantial monetary value.

### B. *THE SALVAGE AWARD*

■ The public policy underlying salvage awards in the Admiralty Court is to hold out a "continuing incentive to undertake the physical and financial risk entailed in salvage operations and to bring the property thus recovered into court for a salvage determination." *Cobb Coin Co., Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 525 F.Supp. 186, 207 (S.D.Fla.1981). The United States Supreme Court in *The SABINE,* 101 U.S. 384, 384, 11 Otto 384, 25 L.Ed. 982 (1879) held: "Salvage is the compensation allowed to persons by whose voluntary assistance a ship at sea or her cargo or both have been saved in whole or in part from impending sea peril, or in recovering such property from actual peril or loss, as in cases of shipwreck, derelict, or recapture." "The elements considered by an Admiralty Court in determining a salvage award are:

(1) The labor expended by the salvors in rendering the salvage service;

(2) the promptitude, skill and energy displayed in rendering the service and saving the property;

(3) the value of the property employed by the salvors in rendering the service and the danger to which such property was exposed;

(4) the risk incurred by the salvors in securing the property from the impending peril;

(5) the value of the property saved; and

(6) the degree of danger from which the property was rescued."

*Cobb Coin,* 549 F.Supp. at 557; *Cobb Coin,* 525 F.Supp. at 207, n. 15 (citing *The Blackwall,* 77 U.S. (10 Wall.) 1, 14, 19 L.Ed. 870 (1869)); *see also* 3A MARTIN J. NORRIS, BENEDICT ON ADMIRALTY: THE LAW OF SALVAGE § 244 (7th ed.1998).

 These elements have been each separately carefully considered by the Court and, based upon the Court's foregoing findings of fact, *supra,* it is clear that the Plaintiff/Salvors are entitled to a full reasonable salvage award.

The Defendants admit that Plaintiff/Salvors are entitled to a salvage award for their services in saving the M/V "Potential." However, they urge the Court to set a low value award based upon factual assertions (a) that the salvors did not property preserve and protect the vessel during the period November 11–14, 2001 that it was in their possession and control; (b) that the danger and risk to salvors was insubstantial; (c) that there was no pollution to the environment.

Items (a) and (b) have been thoroughly examined and determined by the Court in the findings of fact portion of this opinion. Defendants did not establish at trials, by competent proof, any of the three defensive assertions. Indeed, the evidence clearly demonstrates that the property was fully preserved and protected and that the salvors had demonstrated "promptitude, skill and energy" at great personal risk to themselves and where there was substantial risk of total loss of the vessel.

Defendants have attempted to inject an issue (item (c) above) having little relevancy to the issues in this case. The uncontradicted evidence regarding whether or not the environment was polluted as a result of this wreck is that the salvors placed absorbent material in and around the engine room and deck of the vessel to prevent the oil that floated atop the water throughout the vessel from being washed overboard. Defendants suggest that because the 600 gallons of diesel fuel and other contaminants aboard the vessel were not actually discharged into the ocean, thereby necessitating a large "boom" around the vessel, that this should be a factor to minimize the otherwise justified reasonable salvor's award. This simply is a non-issue for the reason that the large "boom" surrounding the vessel or extensive cleanup of the environment afterwards was not necessary due to the prompt and immediate corrective measures taken by the salvors on the site.

The parties have simplified this issue for the Court by entering into a valid binding settlement contract for the sum of $150,000 as payment to the Plaintiff/Salvors for their services in saving the M/V "Potential." (See Section D., *infra* ).

The Court therefore, adopts the settlement dollar amount to which the parties agreed as the fair value of the salvage award and holds that the Plaintiffs Southernmost Marine Services, Inc., a Florida Corporation, D/b/a Sea Tow Key West, Key West Harbor Service, Inc., a Florida Corporation, and Denhart Marine Consultants, Inc., a Florida corporation, shall be awarded the sum of $150,000 as compensation for its expenses and an award for the exemplary salvage service rendered.

C. *THE WRITTEN SALVAGE CONTRACT EXECUTED BY THE OWNER*

 Before leaving the crashed and sinking M/V "Potential," the Defendant/Owner Jeff Keierleber executed a contract of salvage with Plaintiff Sea Tow accepting the responsibility for the charges

for the salvage and towing of his vessel. In fine print on the front page of the document containing the owner's signature appears the following language (in part), "The customer agrees to payment in full of all charges and in the event of any collection procedure, including arbitration, made necessary by reason of the customer's failure to pay, agrees to pay all reasonable charges for collection including costs, attorney's fees and interest." This statement is repeated in full on the reverse side of the contract in bold, large, easily readable lettering.

Defendants have taken the position in this litigation that (a) since Mr. Keierleber only signed in one blank space for his signature on the front of the page (and did not sign in the blank space immediately under the language quoted above, or on the reverse of the contract where space is provided for his signature); and (b) he did not understand what he was signing under the circumstances, that Defendant should not be bound by the written contract as a valid binding agreement.

Recognizing that Mr. Keierleber only signed in one place on the document, the Court finds that this does not establish that he signed the contract in ignorance of an agreement to be responsible for the salvage of his vessel.

After careful observation of the demeanor of the Defendant/Owner Keierleber, from the videotape deposition of him introduced at the trial of these proceedings, the Court finds him to be a capable, sophisticated businessman who runs a business with 300 employees and deals on a regular basis with contractual negotiations in the operation of his extensive business. He has a master's degree and impressed the Court with his overall candor and intelligence. The Court is persuaded that he knew exactly what he was doing when he signed the contract, and did it with a full intent of saving his vessel if it could be saved. He candidly admitted signing the written contract (Defendant's Exhibit No. 3) but seemed to be saying that he should be excused from the provisions thereof because he signed in only one of the three blank spaces provided for his signature.

The Court finds that the essential elements for the formation of a contract were met and that the parties are bound thereby. J. MURRAY, MURRAY ON CONTRACTS § 28 (3d ed.1990).

### D. *THE SETTLEMENT CONTRACT BETWEEN PLAINTIFF/SALVORS AND DEFENDANT INSURANCE COMPANY*

■ Without unduly repeating the Court's findings of fact, it is clear that the salvors and the insurance company entered into a binding contract of settlement of the Plaintiff's salvage claim for $150,000, upon transmittal of Mr. Perkins' faxed letter of November 14th (Pl.'s Exh. 9) and the company's acceptance of the terms of the letter and the issuance of a settlement check.

The letter from Plaintiff to Defendant reads in pertinent part:

"Herewith is our Invoice for Salvage services in the case of the MV POTENTIAL run hard aground on the east Jetty of the Northwest Channel in Key West on November 11, 2001.

This invoice amount has been agreed upon by all parties and is to be paid within 10 days of receipt. The amount $150,000.00 (ONE HUNDRED FIFTY THOUSAND DOLLARS) includes all contractors, subcontractors, materials, labor, equipment, engine service and yard fees up and including November 14, 2001. This amount represents payment in full for all services connected with the salvage of the MV POTENTIAL."

■ The actions of the parties, the exchange of the confirming letter detailing the negotiations between the parties and the mailing of the check in full payment of the salvage services rendered, meet all the requirements for the formation of a valid binding contract; namely, mutual assent, consideration, a definite agreement by parties having the legal capacity to enter into a binding agreement. Murray on Contracts, 3d Ed. § 28. Settlement agreements are governed by principles of local law applicable to contracts generally. *Florida Education Ass'n v. Atkinson*, 481 F.2d 662, 663 (5th Cir.1973), *Wong v. Bailey*, 752 F.2d 619, 621 (11th Cir.1985).

■ Additionally, settlement agreements are favored in the law and will be enforced whenever possible. *Pearson v. Ecological Science Corp.*, 522 F.2d 171, 176 (5th Cir.1975). The Florida Supreme Court in *Bullock v. Harwick*, 158 Fla. 834, 838, 30 So.2d 539 (Fla.1947), held that an acceptance must contain an assent to the same matters contained in the offer, as occurred in this case. Moreover, the Florida Supreme Court held:

> In *Tucker v. Gray*, 82 Fla. 351, 90 So. 158 (1921), this Court, quoting with approval from *Ryan v. United States*, 136 U.S. 68, 10 S.Ct. 913, 34 L.Ed. 447, said:
>
> > "A mere offer to sell real estate, upon specific terms, may undoubtedly be withdrawn at any time before its acceptance. Such is the general rule. But if the offer be accepted without conditions, and without varying its terms, and the acceptance be communicated to the other party without unreasonable delay, a contract arises, from which neither party can withdraw at pleasure."

*Kendel v. Pontious*, 261 So.2d 167, 169 (Fla.1972). A review of the foregoing authority demonstrates that the applicable rule of law is that once a contract is accepted, neither party can withdraw from the contract at its pleasure.

The general rule as to when a contract is deemed accepted in Florida is equally clear. The Court in *Kendel*, 261 So.2d at 169, cited AMERICAN LAW INSTITUTE, RESTATEMENT OF CONTRACTS, § 64, with approval and stated:

> "An acceptance may be transmitted by any means which the offeror has authorized the offeree to use and, if so transmitted, is operative and completes the contract as soon as put out of the offeree's possession, without regard to whether it ever reaches the offeror, unless the offer otherwise provides."[1]

Applying the foregoing authority to the case at bar, acceptance of the settlement agreement was effective upon the Plaintiff's issuance transmittal of the Perkins' letter. Alternatively, a contract could also be formed as of the time the Defendant, Northern Insurance Company, sent out the settlement check to the Plaintiff via overnight mail. At either point in time, a contract was formed and is enforceable.

### E. ATTORNEY'S FEES

■ The Plaintiffs, successful on the merits herein, seeks an award of attorney's fees and costs from Defendants for the expense to which the Defendants have put the Plaintiffs in attempting to enforce their claim. The award of attorney's fees in admiralty actions is discretionary and is specifically permitted in salvage cases. *Compania Galeana, S.A. v. Motor Vessel Caribbean*, 565 F.2d 358, 360 (5th Cir. 1978), *see also Cobb Coin Co. v. Unidentified, Wrecked and Abandoned Vessel*, 549 F.Supp. 540 (S.D.Fla.1982), *Treasure Sal-*

---

1. See also *Morrison v. Thoelke*, 155 So.2d 889, 905 (Fla. 2d DCA 1963), approved in *Kendel*, 261 So.2d at 170.

*vors, Inc. v. Abandoned Sailing*, 556 F.Supp. 1319 (S.D.Fla.1983).

In determining whether or not to exercise the Court's broad discretion under admiralty salvage law to award attorney's fees and costs, consideration is given to the necessity for the litigation and the trial upon the issues raised. Clearly, Plaintiffs were, by the Defendants' own candid admission from day one forward, entitled to a salvage award. The only issue was the amount. When the defensive issues were fully flushed out at trial, it became clear that Defendants had very little, if any, basis in fact for disputing the salvage award they had agreed to, contracted for, and paid. Under these circumstances, the Court finds that there is a sufficient legal basis to award the Plaintiffs its attorney's fees and costs.

Additionally, the written contract entered into by and between the owner of the vessel Mr. Keierleber and the Plaintiff/Salvors on November 11, 2001 provided explicitly for the responsibility of the owner and his insurance company to pay the cost incident to litigation over the salvage and towing of the vessel.

## F. *PREJUDGMENT INTEREST*

Judge Hill, speaking for the Eleventh Circuit Court of Appeals in *Steelmet, Inc. v. Caribe Towing Corp.*, 842 F.2d 1237, 1243–44 (11th Cir.1988), on the issue of entitlement to prejudgment interest held:

> "The law is clear that prejudgment interest should generally be awarded in admiralty cases absent peculiar circumstances, and that the decision of whether to make the award is left to the trial court's discretion. *Chung, Yong Il v. Overseas Navigation Co.*, 774 F.2d 1043, 1056–57 (11th Cir.1985), *cert. denied*, 475

U.S. 1147, 106 S.Ct. 1802, 90 L.Ed.2d 346 (1986); *Miller Industries v. Caterpillar Tractor Co.*, 733 F.2d 813, 822 (11th Cir.1984). While the existence of a genuine dispute is one 'peculiar circumstance' that may justify denying prejudgment interest, *see Parker Towing Co. v. Yazoo River Towing, Inc.*, 794 F.2d 591, 594 (11th Cir.1986), the district judge in this case was most familiar with the parties and issues, and we cannot say that his award of prejudgment interest, as a general matter, was an abuse of discretion."

\* \* \* \* \* \*

"Under Florida law[2], a liability insurers' obligation to pay under a liability policy arises when the insured is held liable. *See Stuyvesant Ins. Co. v. Bournazian*, 342 So.2d 471, 473 (Fla.1976); *Allstate Ins. Co. v. Warren*, 125 So.2d 886, 889 (Fla.App.1961). In *Stuyvesant*, 342 So.2d at 473, the Supreme Court of Florida held that the verdict in a trial involving the insureds 'brought into effect the duty of each liability insurer to pay what its insured owed.' While that decision involved an interpretation of the 'liability insurance' statutory provision rather than the 'marine protection and indemnity insurance' provision, the pertinent language of the provisions is the same. *Compare* Fla. St. § 624.605(1)(b) *with* Fla. St. § 624.607(1)(b). Both provisions describe insurance 'against legal liability'."

\* \* \* \* \* \*

"While an insurer is free to contend that it is not liable under the policy, as Calvert has done for several years, the insurer must pay the cost of the delay in the form of interest. This interest is simply compensation for the use of funds

---

2. The applicability of Florida law is not in dispute: "admiralty courts will generally look to appropriate state law in determining questions involving a marine insurance contract."

*Gulf Tampa Drydock Co. v. Great Atlantic Ins. Co.*, 757 F.2d 1172, 1174 (11th Cir.1985). The parties agree that Florida law is the "appropriate" state law.

which Calvert was obligated to pay as of November 24, 1982. *See Chung, Yong II,* 774 F.2d at 1057."

The Court therefore finds, based upon the foregoing findings of fact and conclusions of law that the Plaintiff/Salvors are entitled to prejudgment interest on the award for services in salvaging this vessel, as ordered herein, from the date of November 11, 2001 until paid at the rate of 11%.[3]

In consideration of the foregoing, it is

ORDERED, ADJUDGED and DECREED as follows:

1. The Plaintiffs are awarded the sum of $150,000 as a salvage award, together with prejudgment interest computed from November 11, 2001 at the rate of 11% until paid.

2. The Plaintiffs are entitled to recover reasonable attorney's fees. The attorney for Plaintiffs shall file affidavits setting forth their requested fees and the basis therefore, within twenty (20) days of the date of this Order, and the Defendants shall respond thereto within ten (10) days from the date they are served.

3. The Court retains jurisdiction for the purposes of entering an award of attorney's fees, costs and final judgment.

---

3. Fla. St. § 55.03(1) requires the Comptroller of the State of Florida, on December 1 of each year to set the rate of interest that shall be payable on judgments and decrees for the year beginning the following January 1. The official interest rate set by the Comptroller pursuant to this statute for the year 2001 was officially set at 11% per annum, with a daily rate .0003014.